## Cuyler's Estate.

*Trusts and trustees — Unauthorized investments — No right on part of trustee to set off gains on one unauthorized investment against the losses on another.*

1. A trustee may not set off gains which he has made on certain non-legal or unauthorized investments against losses which he has incurred in others, as to allow him to do so would, in effect, amount to permitting him to make a profit out of his dealings with the trust property.

*Trusts and trustees — Surcharge of income — Fiduciaries Act of June 7, 1917.*

2. Under section 44 (b) of the Fiduciaries Act of June 7, 1917, P. L. 447, which provides that the amount of interest to be paid in all cases by fiduciaries shall be determined by the Orphans' Court under all the circumstances of the case, but shall not, in any instance, exceed the legal rate of interest for the time being, the surcharge of interest against the accountant is peculiarly within the discretion of the auditing judge, and is not to be disturbed unless it does injustice to some of the parties.

Exceptions to adjudication. O. C. Phila. Co., April T., 1887, No. 103.

Eleanor Cuyler died on Jan. 27, 1886, unmarried, leaving a will, duly admitted to probate, by which she appointed as her executors and trustees, in certain events, C. Stuart Patterson and T. De Witt Cuyler, who duly qualified as executors, and on March 25, 1887, filed their account as such. The account was duly audited by Judge Hanna May 5, 1887, and the balance of principal, stated as $43,887.52, was awarded to the accountants as testamentary trustees. This account was filed Oct. 24, 1923, by C. Stuart Patterson, the surviving trustee, T. De Witt Cuyler, who had been the active trustee, having died Nov. 2, 1922. Cornelia Eleanor Cuyler, surviving life-tenant, died June 20, 1923, and the estate then became distributable. All other matters essential to an understanding of the points decided appear from the following extract from the adjudication by

GEST, J., Auditing Judge:

The only party in interest who objected to the account is Theodore C. Patterson, all the others having in writing or by their attorneys approved the same. These objections will now be considered.

The will devised the estate in trust as to the dwelling-house No. 1825 Spruce Street, to permit the unmarried daughters of the testatrix to occupy the same so long as they might remain unmarried. The trustees were given authority to sell the same, with the consent of the unmarried daughters; the will directed that the proceeds of the sale should be invested in first mortgages secured on improved real estate in the City of Philadelphia, and the real estate, as appears from the account, was sold on June 3, 1888, for $17,500. The will further directed that all the residue of the estate should be invested "in such securities as trustees are by law allowed to invest in." The securities owned by the testatrix at the time of her death were bonds of various railroads, a few shares of stock in the New York Life Insurance Company and Pennsylvania Railroad, and a mortgage on real estate in Philadelphia of $5000, among which the last was the only investment of the class known as legal securities. This, it appears, was paid off, one-half in 1901 and one-half in 1905. It was the clear duty of the trustees to invest the proceeds of the sale of the real estate in first mortgages on improved Philadelphia real estate, and to invest the residue of the estate in so-called legal securities, which include not only mortgages, but also United States, State or municipal securities, as directed in the acts of assembly now consolidated in section 41 of the

Fiduciaries Act of 1917. Instead of complying with the plain directions of the will and the well known and equally plain provisions of the statute, the acting trustees bought a very large number of stocks and bonds of various corporations. The bonds were generally coupon bonds, which circumstances made it difficult, in the absence of any proper books of account, to trace the dates of their purchase and sale or the prices paid. It also appears that some of the stocks, such, for example, as U. S. Steel and Kansas City Southern Railroad, though really belonging to the estate, were held as registered in the name of T. De Witt Cuyler. (See testimony, pages 146, 152.) On some of these investments the trustees realized upon their sale more than the inventory or cost price; on others they realized less. It appears from the statement compiled by Messrs. Long & Company, accountants (pages 8 and 9), that the total amount of these gains was $6114.46, of which $792.98 was derived from the sale of securities received by the trustees from the executors, and $5321.48 from sales of investments made by the acting trustee. The losses sustained by the trustees in the sale of investments appear to have been $6259.58 (testimony, page 34), but the precise amount is not material, as the surviving trustees, in stating the present account, have charged the accountants with the full amount received by them, and, in addition, admit the further charge of $2880 due to the error in appraising the value of the Lehigh Valley Railroad bonds above referred to. Theodore C. Patterson, however, claimed, in addition, that the trustees are liable for the gains made upon the sale of the unauthorized investments. The accountants argued, on the other hand, that the investments made by the acting trustee should be considered as a whole, and that the gains realized should go *pro tanto* to set off the losses which have, as above stated, been made good.

The only case in point to which I have been referred, and I can discover no other, is Lachenour's Estate, 6 Northamp. Co. Repr. 165, where the auditor decided the question according to the view of the present accountants, namely, that "the investments are to be accepted as a whole or rejected as a whole, and, if accepted, the good must be taken with the bad." I cannot, however, find that Albright, P. J., specially presiding in the Orphans' Court of Northampton County, in dismissing exceptions to the auditor's report, discussed the matter at all, and even if he had, his opinion would not be binding on me, so that I regard the question as entirely open for my decision.

In my judgment, the solution of the question depends upon the concurrent application of two principles of law well settled by the decisions of the Supreme Court. First, that a trustee is liable for the losses occasioned by his investments in securities which are not authorized by the will or by statute. This, indeed, is fully admitted by the learned counsel for the accountants, and, as above stated, they have credited the estate with the full value of the assets received. While it is not necessary, therefore, to discuss this principle further, reference may be made to the most recent case on the subject, Taylor's Estate, 277 Pa. 518, as an instance of the strictness with which the rule is enforced by the Supreme Court. See, also, Gaw's Estate, 12 Phila. 4; Hemphill's Appeal, 18 Pa. 303, and Ihmsen's Appeal, 43 Pa. 431. The second principle, equally uncontrovertible, is that a trustee cannot make any personal profit from his dealings with the trust estate: Lewin on Trusts (12th ed.), 306, in connection with which Raybold v. Raybold, 20 Pa. 308, may be referred to, where the court said that no principle is better settled than that a trustee is not permitted to obtain any advantage to himself in managing the concerns of the *cestui que trust*. And in Norris's Appeal, 71 Pa. 106, the Supreme Court affirmed the opinion of Paxson, J., in the Orphans' Court

of Philadelphia, in which he said: "In no event will the trustee be allowed to make a profit out of the trust funds. The law holds out no inducements to a trustee so to misapply the estate. He may lose, but he cannot make by so doing." This language was quoted with approval in Baker's Appeal, 120 Pa. 33.

Now, if, in the present case, the trustee is permitted to set off the gains which he has made in certain non-legal investments against the losses which he has incurred in others, that would be nothing else but his making a profit out of his dealings with property which is not his own. I can see no difference between putting the profits in his own pocket and using them to defray his debts. It seems to me to be inconsistent to maintain that the consequences of one unauthorized act should be mitigated by the more fortunate results of another, and if we consider the case from the standpoint of public policy, on which all these principles ultimately rest, this conclusion is greatly strengthened, for if a trustee who has made an unauthorized and losing investment knows that he may recoup the loss by better luck in another, he would certainly be tempted to embark on another enticing speculation, which, as holding out a prospective profit, would be attended with further and perhaps even greater risk to the trust funds. "And the last state of that man is worse than the first." The answer made is not sufficient, namely, that the losses having been made good, the estate is not diminished and has lost nothing, for that would be as true if there were no losses at all. The trustee, having made profits, would not be allowed to say that the estate has not been diminished and that he is only obliged to turn over the assets which he received.

The learned counsel for the accountants urged that the contention of the exceptant was in effect to penalize the trustee as for a breach of trust, and Darlington's Appeal, 245 Pa. 212, is cited, in which the Supreme Court said: "Where the funds of a trust estate are invested in securities not expressly authorized by the acts of assembly, there is not a breach of trust, although there may be liability for loss by reason of depreciation." It is sufficient for me to observe that, so far as this immediate question is concerned, it is quite immaterial whether the acts of the trustee should be styled a breach of trust or not. I am entirely satisfied that he acted without any moral fault, much less fraud, but the fact remains that, with the plain directions of the will before him, he, from the very beginning to the very end, violated them. It is argued by the learned counsel for the accountants, and it is very possible, that he did so with a sincere and commendable desire of benefiting his aged aunts and increasing their income, but his motive is, so far as we are now concerned, aside from the question. Nor is the decision in Small's Estate, 144 Pa. 293, applicable to the present case, because the loan made to the corporation in Small's Estate was an entire transaction, the results of which should be considered as a whole, while in the case at bar there were over a score of separate investments having no interconnection, some of which were profitable and some the reverse. I conclude, therefore, that the trustees are liable for the sum of $6114.46, but as only one of the parties in interest, namely, Theodore C. Patterson, entitled to one-sixth, is objecting, I see no use in surcharging the accountants with the entire amount, but will award to Theodore C. Patterson one-sixth of that amount, or $1019.08. A similar method of surcharge was employed by me in Tull's Estate, 1 D. & C. 292, where only one of three distributees objected to an allowance of excessive commissions, in which the other distributees acquiesced.

I now pass to the question raised by Mr. Theodore C. Patterson as to surcharge on income account. Theodore C. Patterson, as administrator, or as one

of the next of kin and distributees, of the estates of Maria Cuyler Grier, who died Feb. 16, 1902, of Caroline Tappan Cuyler, who died May 19, 1902, of Sarah Fenner Cuyler, who died May 28, 1907, and of Cornelia Eleanor Cuyler, who died June 20, 1923, claimed to surcharge the accountants with certain sums alleged by him to be due and unpaid to the estates of these life-tenants at the dates of their respective deaths, namely, to the estate of Maria C. Grier, $223.79; to the estate of Caroline T. Cuyler, $925.69; to the estate of Sarah F. Cuyler, $1024.93, and to the estate of Cornelia E. Cuyler, $11,238.79, and in each case further claimed that interest was due on these amounts from the respective dates of their deaths to July 16, 1924. Elaborate calculations of these amounts, prepared by Messrs. W. A. Long & Company, accountants, were submitted to the court and will be found filed of record.

The question raised practically is, with what interest or income should a trustee be charged who fails to invest the assets of the estate or invests them in non-legal securities? In the present case it must be considered in connection with the above rulings that such a trustee is bound to make good all losses incurred by him in his unauthorized acts, and chargeable with all gains made by him therein.

In my opinion, section 44 *(b)* of the Fiduciaries Act of 1917, which substantially re-enacted section 18 of the Act of March 29, 1832, P. L. 194, 1 Purdon, 1126, has an important bearing on this question. The Act of 1832 reads as follows: "The amount of interest to be paid *in all cases* by executors, administrators and guardians shall be determined by the Orphans' Court *under all the circumstances in the case*, but shall not in any instance exceed the legal rate of interest for the time being." As it appears from the report of the Commissioners of 1830, this was a new section, but they added that the principle is familiar in the courts of equity, and as their remarks seem pertinent to the present case, I will quote them: "The non-performance of a duty, however, may, it is obvious, arise from various causes; and the shades may be numerous between simple neglect and gross fraud on the part of the executor or other trustee. *According to the prevailing practice, however, of our courts, no distinction is made in visiting interest upon such defaulting trustees; and, with very few exceptions, the legal rate of interest, or 6 per cent., is uniformly charged.* The courts of equity, however, recognize the distinction between negligence and corruption in the conduct of trustees, and measure the rate of interest accordingly. It seems peculiarly fitting that our courts should possess similar power at the present time, when the market rate of interest is so much below the legal rate, and when the consequence of charging the legal rate in the case of mere negligence would be to compel payment by a trustee of what he could not in the ordinary course of things have received; and to give to those interested a profit on their funds, which they could not easily have made by their usual mode of investment."

With these remarks before them, the Commissioners of 1915 recommended the re-enactment of the section, only substituting "fiduciaries" for "executors, administrators and guardians," a change which merely clarified its evident intent.

In their construction of this statute, our courts have observed the distinction adverted to by the Commissioners of 1830 of the numerous shades between simple neglect and gross fraud in the conduct of trustees. Thus, in cases of fraud or where the trustee had used the money of the estate for his own benefit or his private business, he has been held liable for 6 per cent. interest, as in Norris's Appeal, 71 Pa. 106, and in Flynn's Estate, 21 Pa. Superior Ct. 126;

Cuyler's Estate.

or, if he made profits in his business, the *cestui que trust* is entitled to elect to take the profits, as in Robinett's Appeal, 36 Pa. 174; Seguin's Appeal, 103 Pa. 139. In cases, however, where the trustee has been charged merely with negligence in not investing the funds of the estate, or in investing them in non-legal securities, a different rule is adopted, and the trustee is liable merely for interest at a rate "determined by the court under all the circumstances of the case:" Elton's Estate, 48 Pa. Superior Ct. 585. In Dugan's Estate, 18 W. N. C. 39 (1886), the trustee was charged with 4 per cent. interest on uninvested funds, and Penrose, J., said: "We cannot help knowing for several years past there has been great difficulty in procuring proper investments for trust funds. The act of assembly permits the court to fix the rate of interest in cases of this character, and we cannot say, under all the circumstances, that the action of the auditing judge does injustice to any of the parties."

It is, therefore, incumbent on me to consider what, in the language of the act of assembly, are "the circumstances of the case."

Now, the complaint of Theodore C. Patterson is founded in general on the proposition that the trustee coming into the possession of non-legal investments should have converted them forthwith and invested the proceeds in securities directed by the will; that is, in mortgages or other investments authorized by law. This is correctly stated, but, as was said by Black, C. J., in Light's Appeal, 24 Pa. 180 (1854), the "legatees ought to be satisfied if they receive as much as they would have got if he had done his duty," and the remarks of Judge Butler in Roberts's Estate, 8 Dist. R. 303, are instructive. Now, where 6 per cent. might have been obtained on mortgage loans, it would be very just to charge the trustees the legal rate, as has been done in some of the cases, but it appears from the testimony in this case—and, indeed, the court might almost take judicial notice of the fact—that the average rate of return on mortgage investments from 1887 to 1923, after allowing for the State tax, would be approximately 4¼ per cent., and if investments were made in State or municipal securities, which the trustees might have made, the return would be still less.

The assets awarded to the trustees in May, 1887, amounted to $43,887.52, to which should be added $2880 to correct error in appraisement of the Lehigh Valley Railroad bonds, making $46,767.52, and there should be deducted the appraised value of household furniture, $1754.50, leaving $45,102.02. If to this be added the purchase price, $17,500, of the Spruce Street house, which, however, was not sold until June, 1888, the total would be $62,602.02. If this sum had been continuously invested in mortgages netting 4¼ per cent., without making any allowance for time in which funds would necessarily await suitable opportunity for investment, and without any deduction for commissions which would normally be allowed, the interest for, say, thirty-six years, would be 153 per cent., or $95,781.06, or, let us say, with a liberal allowance for errors, certainly less than $100,000. And even if the gain on the securities sold and herein allowed as a surcharge, $6114.46, be added to the capital of the estate and interest allowed from the beginning of the trust, although the securities were sold at various times during the life of the trust, the total interest would be less than the interest received, for the account shows that the accountants received up to July 30, 1923, the death of Cornelia Eleanor Cuyler occuring June 20, 1923, $106,725.25, so that it would seem that they collected and disbursed in expenses and payments to the several life-tenants a little more than, or certainly as much as, they would have received had they invested the estate from the beginning in first mortgages.

Cuyler's Estate.

The surcharge of interest claimed by Theodore C. Patterson is based upon the calculations of Messrs. Long & Company, which is stated to be made on the theory that the trustees are chargeable with what would have been the cash balances in their hands at various dates after elimination of non-legal investments, which aggregated large sums of money. On these balances interest is claimed at 4 per cent. for the first twenty years of the trust and 4½ per cent. for the remaining sixteen years, and the accountants are charged with interest and dividends received, less an allowance for interest on the sums invested. The total amount of income thus found to be due by Messrs. Long & Company is $119,642.43, as against $106,730.25, as shown by the account of the trustees, the difference being $12,912.18, with which Theodore C. Patterson asked that they be surcharged. Included in this amount, however, is that which would be chargeable against the trustees if they are to be held responsible both for interest on the cash in their hands and on that invested in non-legal securities, and also with the amount of any interest or dividends received on the non-legal securities, less interest on the amounts so invested. And this excess interest, it appears, includes interest on the gains realized by the trustees on sales of non-legal securities and the interest charged on amounts invested in non-legal securities, where the interest or dividends were less than the interest so charged. I am of opinion that this theory of surcharge is, in the circumstances of the case, too rigorous, and, in effect, would penalize the trustees. Perhaps in some cases of moral delinquency or gross misuse of funds it might be enforced, but in the present case I do not think it would be just. Much was said in the briefs submitted as to the rights of the *cestui que trust* to retain or to reject non-legal securities, but, strictly speaking, his rights do not appear in this form, for the securities were in most part sold by the acting trustee before his death, and those remaining in specie at his death were promptly sold by the co-trustee, as it was his duty to do.

It will be observed that the liability of the accountants for a surcharge in principal account and their liability for a surcharge in income account depend upon somewhat different, yet consistent, principles. In the former case, the trustees are liable for what they actually received, either in securities or in gains on sales of securities. Whatever they so received belonged to the trust estate. Their liability for income depends upon what they would have received had they performed their duty according to the will and the statute, together with as much more as they actually did receive: Roberts's Estate, 8 Dist. R. 303. And, as to this, I must add that, according to the calculations made by Mr. Hunsicker and appended to his brief, which calculations are annexed hereto as an exhibit, the accountants appear to have omitted from the income account interest and dividends actually received by them amounting to $1104.14. I can find no answer to this claim in the brief submitted by the learned counsel for the accountants, and I, therefore, feel constrained to surcharge the accountants with that sum. This is purely a matter of fact, and if it could be shown that my findings in this respect are erroneous, they may be corrected. I had not the benefit of oral argument in this complicated case, which would doubtless have clarified this and other questions that are presented, for I have had before me for consideration the account as filed, a restated account, a supplemental account, a restatement of the account by Mr. Hunsicker, and a detailed restatement and analysis by Messrs. Long & Company, in connection with voluminous testimony and the statements and briefs of counsel.

There is, moreover, another circumstance of the case which I think I am called on to consider. The death of Maria C. Grier occurred on Feb. 16, 1902, and that of Caroline T. Cuyler on May 19, 1902, over twenty-one years before the death of the surviving life-tenant in 1923, and Sarah F. Cuyler died in 1907, sixteen years before that date. No claim such as this was made by them in their lifetime or by any one in their behalf. Theodore C. Patterson, who now claims that they did not receive their just income, made no move until the present time, although it would seem clear to me that he might have cited the trustees to file an account at any time (Heath's Estate, 10 Dist. R. 281; Noble's Estate, 27 Dist. R. 336; Hartman's Appeal, 90 Pa. 203; Dugan's Estate, 17 Phila. 454; Sloan's Estate, 7 Dist. R. 363), and if he had done so during the lifetime of T. De Witt Cuyler, the case would doubtless have been very differently presented. His delay or laches does not commend itself to a court of equity, where stale claims are not favored: McCartney's Estate, 18 W. N. C. 51. None of the three life-tenants who died many years ago made any complaint. All acquiesced in the management of their estate by the trustee, and if in some cases an exact calculation made as of the dates of their respective deaths might have disclosed that some small balances were due them, the trustees derived no advantage therefrom, as these balances were paid to the survivors or survivor. The claim that these balances are not only demandable at this lapse of time, but demandable with interest at 6 per cent., does not merit serious discussion.

Upon the whole, and considering, as I should, under the act of assembly, all the circumstances of the case, I am of opinion that no greater surcharge should be made than that which I have awarded in this adjudication.

*John Hampton Barnes* and *Francis I. Gowen,* for accountants.

*Theodore C. Patterson* and *Charles Hunsicker,* for exceptant.

HENDERSON, J., Nov. 11, 1924.—The accountant and one of eight distributees, entitled to a one-sixth share, have filed a number of exceptions, and as we agree with the rulings of the auditing judge and for the reasons given by him, they are all dismissed.

We shall, however, add a word in reference to certain of the exceptions. The facts are fully set forth in the adjudication. The accountant complains that, while he is charged with profits arising from unauthorized investments, he should be permitted to set off against them the losses which he has suffered also from unauthorized investments. The reasons given by the auditing judge refusing such set-off are rested so firmly on grounds of public policy that nothing need be added thereto.

The distributee exceptant seeks, however, to apply the same rule in aid of a surcharge of income. He contends that while the surviving life-tenant was in receipt of items of interest ranging from 5 to over 7 per cent., there were from time to time small items of principal uninvested, and for a period of years no income was received from a considerable unauthorized investment, and he asks that 4½ per cent. interest be surcharged on these items.

The auditing judge points out, however, that under section 44 *(b)* of the Fiduciaries Act of June 7, 1917, P. L. 447, the court shall determine the interest to be allowed "in all cases," having regard, however, to "all the circumstances of the case." The question, therefore, before us on these exceptions is, to use the language of Judge Penrose in Dugan's Estate, 18 W. N. C. 39, does "the action of the auditing judge" do "injustice to any of the parties."

The auditing judge held that under the facts of this estate it was fair to regard the income received during the whole period of the trust, and as it

exceeded what would have been netted from well-secured first mortgages, he refused the surcharge. The exceptant complains that the rule applied to surcharge the capital account should be applied to a surcharge of income. We cannot follow him in this contention, for the reason that the surcharge on the principal account rests upon considerations of public policy. No such considerations apply to the interest to be allowed as income, and which is, under section 44 *(b)* of the Fiduciaries Act of June 7, 1917, P. L. 447, peculiarly within the discretion of the auditing judge and not to be disturbed unless it does "injustice to any of the parties."

In addition to the facts and circumstances found by the adjudication, we observe that when these trustees filed their executors' account no commissions were taken. These commissions, with interest thereon for the period of the trust, together with commissions on income, would have amounted to over $12,000. While it is true that no commissions were claimed at any time, it is equally true that the parties in interest have benefited thereby.

The exceptions are dismissed and the adjudication is confirmed absolutely.