Mercer County *v.* Cantelupe (et al., Appellant).

Mercer County *v.* Cantelupe (et al., Appellant).

Mercer County, Appellant, *v.* Cantelupe et al.

In re Accounts of Cantelupe, Tax Collector.

Argued March 26, 1941.   Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ. Judgments affirmed.

E. W. *Arthur* and L. R. *Rickard,* with them J. M. *Magee,* for appellant.

*Nathan Routman,* County Solicitor, for appellee.

*T. A. Sampson,* with him *Donald Thompson, Stephen Emery* and *Stranahan & Sampson,* for appellant.

*Nathan Routman,* County Solicitor, for appellee.

*Nathan Routman,* County Solicitor, for appellant.

*Emrys G. Francis,* with him *Fred T. Fruit,* for appellee.

*E. W. Arthur* and *L. R. Rickard,* with them *J. M. Magee,* for appellant, No. 38.

*T. A. Sampson,* with him *Donald Thompson, Stephen Emery* and *Stranahan & Sampson,* for appellant, No. 40.

*Thomas H. Armstrong,* for appellant, No. 65, and for appellee, Nos. 38 and 40.

*Emrys G. Francis,* with him *Fred T. Fruit,* for appellee, No. 65.

OPINION BY MR. JUSTICE STERN, April 21, 1941:

The legal problem presented in this case arises from the misappropriation by a tax collector of funds collected by him during a number of successive years in which he held office and the practice he adopted of attempting to cover the shortage in one year by applying thereto collections of the following year. The result

is a dispute among the sureties on his bonds as to the proper method of apportionment of their liability for the loss. The public agencies for which the collections were made are also vitally interested in the determination of this question.

Joseph Cantelupe was collector of taxes in the City of Farrell, Mercer County, from 1922 to 1935 inclusive. For the year 1933 American Surety Company of New York was surety on his bond in the sum of $40,000 for collection of the county taxes and in the sum of $30,000 for collection of the school taxes. For 1934 National Surety Corporation was surety in the sum of $20,000 for the county taxes and in the same amount for the school taxes. For 1935 Continental Casualty Company was surety in the sum of $15,000 for collection of the county duplicate and in the same amount for the school duplicate.

Some time after the termination in 1935 of Cantelupe's service as tax collector, it was discovered that he had misappropriated funds of the county to the extent of approximately $27,000 and of the school district in the amount of almost $35,000, nearly all the deficiencies being apparently on the 1935 duplicates. Beginning in 1938 various legal proceedings were instituted by the county and the school district, consisting of the entry of judgments by confession on some of the bonds, the commencement of actions in assumpsit on others, and a petition by the school district for leave to appeal nunc pro tunc from the controller's audits of the collector's school district accounts for 1933 and subsequent years, the statutory period for appeals having expired. It is not necessary to enter into the details of these proceedings. The court properly[1] allowed the appeal nunc pro tunc on the ground that the true

---

[1] *Zeigler's Petition,* 207 Pa. 131, 56 A. 419; *York County v. Thompson,* 212 Pa. 561, 61 A. 1024; *Lackawanna County's Appeals,* 296 Pa. 271, 145 A. 843.

nature of the shortages in the accounts had been fraudulently concealed by the manner in which Cantelupe manipulated his remittances of collections for the various years. The parties finally agreed that the entire situation, involving all the claims of the county and the school district against the sureties, should be presented to the court, which, without a jury, should determine the amount of the defalcations upon the respective duplicates and to what extent each surety was liable therefor.

The first question was one of fact. Cantelupe deposited all collections of school and county taxes in one account in the name of "Joseph Cantelupe, Tax Collector." There were additional moneys deposited in the same account, consisting apparently, for the most part, of some of the city tax collections, and remittances, less in amount than such additional deposits, were made to the city out of this account;[2] Cantelupe testified that he did not deposit any personal funds therein.

It was established that at the end of the year 1933 there was a shortage in the county taxes of $15,584.25. The court found that in order to conceal this deficiency Cantelupe misapplied $11,545.02 of 1934 collections to the 1933 account, and that there was an additional shortage on the 1934 duplicate of $4,504.85; similarly, that he misapplied from his 1935 collections the sum of $20,089.35 to make good the previous shortages, and that there was an additional shortage on this duplicate of $6,935.25, less a conceded credit of $758.03, or a net of $6,177.22. Some of these deficiencies were due to Cantelupe's failure to collect, but the larger part to his misapplication of funds from a current duplicate to pay the shortage on a previous one. The court held that the funds collected in any given year, but used to cover the deficiency of a preceding year, should be re-

---

[2] The City of Farrell does not claim any shortage in the accounting for its taxes.

stored as a credit to the account of the year in which the misapplication was made, and, acting on this principle, the court decided that American Surety Company of New York, the surety for 1933, should be held liable for the deficiency in that year, namely, $15,584.25, but National Surety Corporation, surety on the 1934 bond, should be charged, not with the total shortage which existed at the end of that year, but only with what remained after replacing the amount improperly taken from that year's fund to make good the 1933 deficiency, leaving as the actual shortage for the year 1934, the sum of $4,504.85. In the same way the court held that the apparent 1935 shortage should be reduced by the amount which was misapplied from that year's collections to cover the deficiencies of the former years, leaving $6,935.25, less the credit item of $758.03 previously referred to, as the real shortage for that year and the amount for which Continental Casualty Company, the 1935 surety, was liable. Accordingly, the court entered judgments against the three surety companies in the amounts thus indicated, with additions of interest to the date of each judgment.

The same process was followed with regard to the school taxes. The court found that at the end of the year 1933 there was a shortage in those taxes of $20,164.25, that the collector misapplied $16,594.62 of 1934 collections to the 1933 account, that the shortage on the 1934 duplicate, after restoring as a credit this misapplication, amounted to $3,767.14, that the collector misapplied $20,000 of 1935 collections to cover previous deficiencies, and that the shortage for 1935, after restoring the amount of such misapplication, was $10,891.39. Here, too, some of the deficiencies were due to Cantelupe's failure to collect, but nearly all to his misapplications of the funds. The court entered judgments against American Surety Company of New York, National Surety Corporation and Continental Casualty

Company in the respective amounts of $20,164.75, $3,767.14 and $10,891.39, with additions in each case of interest to the date of judgment.

None of the surety companies complains of the court's findings as to the amounts of the collector's defalcations for each of the years 1933, 1934 and 1935. American Surety Company and National Surety Corporation insist, however, that, since all remittances came from the one mixed bank account, the court was not justified in finding, for example, that payments made to the county in 1934 on behalf of the 1933 duplicate, and in 1935 on account of the 1934 duplicate, consisted of county taxes for the years in which the remittances were made. They say that a check remitted by Cantelupe to the county in 1934 to liquidate his liability on the 1933 duplicate may have represented collections, not of 1934 county taxes, but of school or city taxes for that or some other year. Cantelupe himself testified that his method was to make up the shortage in county taxes for one year by remitting county taxes collected by him on the following year's duplicate, and similarly to make up deficiencies in school taxes by remitting from school taxes collected in the subsequent year. In reply to this, these two surety companies maintain that, whatever his intentions may have been in that regard, it could not be determined, when he checked out of a general bank account containing collections derived from various sources, exactly what funds were represented by the particular check. But there was convincing testimony given by an accountant, who showed that remittances made by Cantelupe in 1934 and directed by him to be applied to the 1933 duplicate were overwhelmingly in excess of his actual collections in 1934 on the 1933 duplicate, and could have represented only collections made on the 1934 duplicate, and so likewise in the case of other years. As for the contention that the remittances to cover deficiencies in county taxes

may have consisted of the following year's collections of school or city taxes, or vice versa, there is a presumption that when Cantelupe made remittances to the county he was remitting county funds, when he remitted to the school district he was remitting school funds, and when he remitted to the city he was remitting funds derived from the collection of city taxes. Presumptions of this type in the case of withdrawals from a mixed fund are not strangers to the law. Thus in *Knatchbull v. Hallett*, L. R. 13 Ch. Div. 696 (see *Erie Trust Co.'s Case (No. 1)*, 326 Pa. 198, 204, 191 A. 613, 615, 616; *Trestrail, Admr., v. Johnson, Sheriff*, 298 Pa. 388, 397, 148 A. 493, 495); it was held that where an account contains mingled trust funds and individual funds of the trustee, and the trustee withdraws money therefrom for his personal use, there is a presumption that he is drawing his own money first and not embezzling any of the trust funds; therefore the beneficiary of the trust, without the necessity of tracing the individual dollars, may successfully claim the residue as his own up to the amount due him from the trust. So, here, it must be presumed, in the absence of clear proof to the contrary, that Cantelupe did not misappropriate city or school funds by remitting them to the county, or city or county funds by remitting them to the school district. With the benefit of this presumption and the testimony of the collector and the accountant, the factual findings of the court are virtually impregnable.

We are brought, then, to a consideration of the legal question whether, under such facts, there should be an apportionment of liability among the surety companies according to the actual shortages applicable to each year, or whether practically the entire loss should be thrown upon Continental Casualty Company, the surety on the 1935 bond, because from the collections of that year the great bulk of the funds to cover the previous deficiencies were taken. In *Commonwealth v.*

*Knettle*, 182 Pa. 176, 38 A. 13, and *Commonwealth v. Gutelius (No. 1)*, 287 Pa. 441, 135 A. 214, a tax collector applied the money received on the duplicate of one year to a balance due on the duplicate of a preceding year or years, and it was held that his sureties on the bond for the later year were liable for his misappropriation of the money received in payment of that year's taxes, even though he had paid the money into the public treasury to make good his previous defalcations. But these cases, and the many similar ones in other jurisdictions, decide only that where, in an action on the bond, there is shown to be a shortage in the account for the year covered by the bond, it is immaterial what the collector did with the money unaccounted for,—whether he used it for private purposes or to satisfy a debt owed to the public agency for which the collections were made. Those decisions have no relevancy to the present situation. Were this an action by the county or school district against Continental Casualty Company, the surety on the bond for the last year, recovery undoubtedly could be had, up to the amount of the bond, for all the collections of that year for which the collector failed to account irrespective of the purpose for which they were used, but here, the court having before it all the sureties as parties, equitable considerations must prevail in the apportionment of the loss among them. The surety on the last bond has rights somewhat in the nature of rights of subrogation, arising from the fact that most of the deficiency in the year covered by that bond were not due to *additional* abstractions of the public funds, but merely to the collector's attempt to delay the detection of his defalcations. Had the money remitted to the county to make up a previous deficiency been obtained by the collector from some other source, whether an individual or another public agency, such a payment would have relieved the surety on the bond for the year in which the

deficiency occurred, but the shortage could not be made good to the county by a remittance to it of its own moneys collected in a subsequent year. The same is true, of course, in the case of the school district. Indeed, if the county and the school district were to be limited for recovery of their losses to the bonds of the year, 1935, on the theory that all previous shortages were liquidated, they would be able to recover but a relatively small amount of the actual defalcations, and this would be the unjust result of permitting the collector to juggle his remittances in disregard of the facts. Certainly the county itself could not knowingly have applied collections on the 1934 duplicate to the 1933 account and thus deliberately have thrown the entire loss on the surety on the 1934 bond in relief of the surety on the 1933 bond.[3] Why, then, should the collector be accorded such a right? While, ordinarily, a debtor may direct to which of two or more accounts a payment made by him should be applied, this is only where he is making payment with his own money and not where he is remitting funds already belonging to his creditor. Could an attorney, entrusted by a client with the collection of two accounts, and embezzling the proceeds of one of them, make restitution by applying to the defaulted account the proceeds of the other collection?

The court was right in not permitting the inherent equities of the situation to be destroyed by the arbitrary and fraudulent device of the collector.

All the judgments are affirmed.

---

[3] *United States v. January,* 7 Cranch, (11 U. S.) 572; *Postmaster General v. Norvell,* 1 Gilpin 106, 125, 126, 135; *United States v. Eckford's Executors,* 1 How. (42 U. S.) 250, 260-263; *State of Texas v. Middleton's Sureties,* 57 Tex. 185; *Commonwealth v. Reitzel,* 9 W. & S. 109, 114, 115.