In re: PAXSON TRUST I

Appeal of: P.M.P. & R.P., Appellants.

In re: Paxson Trust I

Appeal of: J.P., Appellant.

In re: Paxson Trust I

Appeal of: P.L.P., Appellant.

Superior Court of Pennsylvania.

Argued Sept. 28, 2004.
Filed Jan. 27, 2006.

Martin J. King, Newtown, for P.M.P. &
R.P., Appellants.

Tina M. Weber, Lionville, for J.P., ap-
pellant.

BEFORE: STEVENS, KLEIN, JJ.,
and McEWEN, P.J.E.

OPINION BY STEVENS, J.:

¶ 1 This appeal and cross appeal involve
the interpretation of a trust deed.

## FACTUAL HISTORY

¶ 2 John C. Paxson (Paxson) and Paula
Lynn Zanni Paxson are the parents of four
children: Paula Marie Paxson, Rebecca
Paxson, John Justin Paxson, and Robert
Paxson (the Children). The Paxsons were
married in 1973, separated in August 1999,
and were divorced on November 29, 2001.
During the divorce action, Paula Lynn
Paxson advised the Children that the fami-
ly home was held in trust for their benefit.
John Paxson's brief at 2. The trust was
created by the Children's maternal grand-
father, Dr. Anthony Zanni, now deceased.
By deed dated October 14, 1987, Dr. Zanni
had conveyed title to 6.06 acres of proper-
ty (the Zanni Trust property) to the Pax-
sons as trustees for the Children.[1] The

---

1. The Trust Deed was prepared by John Pax-
son's attorney, Samuel Glantz, N.T. 12/2/02 at
38, and states in pertinent part:

> IN TRUST NEVERTHELESS for the fol-
> lowing uses, intents, and purposes and UN-
> DER AND SUBJECT to the several provi-
> sos, restrictions, limitations, and conditions
> following, that is to say, the said John Pax-
> son and Paula Lynn Paxson, Trustees, their
> successors and assigns, shall manage, let
> and demise and take and receive the rents,
> issues and profits thereout all taxes and
> charges, to pay the net rents issues and
> profits unto the said John Paxson and Paula
> Lynn Paxson for their sole and separate
> use, for an [sic] during the term of their
> natural life, or to suffer and permit the said
> John Paxson and Paula Lynn Paxson to
> occupy the said premises, they the said
> John Paxson and Paula Lynn Paxson to pay
> all taxes and charges on the hereby granted
> premises and make all necessary and prop-

> er repairs thereof, AND immediately upon
> the death of the said John Paxson and Pau-
> la Lynn Paxson, then the said premises
> shall vest in their children, absolutely and
> in fee simple, free, clear and NEVERTHE-
> LESS, that it shall and may be lawful for
> the said John Paxson and Paula Lynn Pax-
> son, Trustees, as aforesaid, at any time dur-
> ing the continuance of said Trust, to Sell
> and dispose of the said premises hereby
> granted, or any part thereof, or to mortgage
> the said premises or any part thereof, and
> by proper deed or deeds, conveyance, mort-
> gage or mortgages, or assurances in the
> law, to grant, convey mortgage, assure the
> same to the Purchaser or Purchasers, mort-
> gagee or mortgagees thereof, without any
> liability on the part of such purchaser or
> purchasers, mortgagee or mortgagees to see
> to the application of the purchase or mort-
> gage money. Notwithstanding anything
> herein to the contrary the Trustees there-
> fore and hereby do not have the power to

Paxsons joined in the deed and accepted the terms of the trust. Adjudication, Finding of fact 28.

¶3 The Paxsons had been living in a house on the Zanni Trust property since 1985. Adjudication, Finding of fact 25. The 6.06 acres was originally part of a 52 acre parcel owned by Dr. Zanni and his wife. *Id.* at 29. In the early 1970's, all but the 6.06 acres were condemned by the Neshaminy Water Resource Authority for the Dark Hollow Dam project. *Id.* at 30. The dam project was never completed. *Id.* at 32. Aware that the house's garage, septic system, well and shed were located on part of the condemned acreage, the Paxsons began extensive negotiations in 1987 to repurchase the portion of property on which those structures were located [the County property]. *Id.* at 36–38.

¶4 During the ongoing negotiations to purchase the County property, the Paxsons obtained a commercial loan in the amount of $100,000.00 from The First National Bank and Trust Company of Newtown ("Newtown Bank") on January 11, 1988. *Id.* at 55a; N.T. 12/2/02 at 57. The loan was secured by mortgages against the Paxsons' assets, and the Zanni Trust property. N.T. 12/2/02 at 57, 59. The Paxsons' assets and the Zanni Trust property were also used to secure a commercial equity credit line in the amount of $10,000.00

from Commonwealth State Bank on June 26, 1989. N.T. 12/2/02 at 58–59.

¶5 On August 25, 1989, the Paxsons and a business partner, Arthur Azarchi, purchased the Sumney Tavern, as well as the real estate on which the Tavern was located, for a total of $650,000.00. N.T. 12/2/02 at 33, 108. A down payment of $300,000.00 was required ($150,000.00 from the Paxsons, $150,000.00 from Azarchi). *Id.* at 108–109. In furtherance of this obligation, on September 7, 1989, the Paxsons obtained a commercial mortgage loan in the amount of $150,000 from Commonwealth State Bank. *Id.* at 60, 109. This loan was secured by the Paxsons' assets and the Zanni Trust property, as well as the by the land on which the Tavern was located. *Id.* at 109. The remainder of the purchase price was also financed by additional mortgages of $160,000.00, $130,000.00 and $60,000.00. *Id.* at 109–114, Adjudication, Finding of fact 66.

¶6 By May 1991, negotiations for the purchase of the County Property reached a successful conclusion and it was agreed that 5.36 acres would be purchased for $21,200.00, and titled in Mrs. Paxson's name alone. N.T. 12/2/02 at 66, 71–72; Adjudication, Findings of fact 40–41. The Children alleged that the majority of the money used to purchase the County property was directly traceable to money which had been willed to Paula Marie by her grandfather, Dr. Zanni.[2] Adjudication,

---

grant and convey the subject premises by Deed in lieu of foreclosure.

2. Dr. Zanni's will had been handwritten by him and signed on September 22, 1977. Adjudication, Finding of fact 139. It gave all his "possessions and monies to my grandchildren—Leonard Zanni, Jr., Paula Marie Paxson and Michele Maria Passarelli." Plaintiffs' Exhibit 3. Of the Paxson children involved in this case, only Paula Marie had been born when Dr. Zanni wrote his will. Dr. Zanni died on October 4, 1988, and his will was probated on November 15, 1988, giving Paula

Marie a one-third residuary share of the Zanni Estate. Adjudication, Findings of fact 21, 139–141. On March 6, 1991, when Paula Marie was fifteen years old, the executor of Dr. Zanni's will made a risk distribution of Paula Marie's inheritance. *Id.* at 143–144. The resulting $20,000.00 check issued on March 6, 1991 to "Lynn Paxson, parent of Paula Paxson," was endorsed by Paula Lynn Paxson and deposited into a checking account titled in the names of John Paxson or Paula Paxson, Trustees, on March 21, 1991. *Id.* at 143, 161; N.T. 12/2/02 at 10; Plaintiffs' Exhibit 4; Plaintiffs' Exhibit 32. On May 23,

Findings of fact 150. From 1987 through 1999, the Paxsons made substantial improvements to the house and garage on the Zanni Trust and County properties. *Id.* at 48–53.

¶ 7 On March 13, 1995, the Paxsons agreed to sell all but .918 acres (Lot 32) of the Zanni Trust and County properties to Heritage Building Group for $350,000 ($174,230.00 for the portion of the Zanni property being sold, and $175,770.00 for the portion of the County property being sold). Adjudication, Findings of fact 70–71, 75; N.T. 10/22/02 at 68; N.T. 12/2/02 at 104. Settlement did not occur until 1998, however. Adjudication, Finding of fact 76. In the meantime, the Paxsons obtained several additional loans and purchased more real estate.

¶ 8 On May 12, 1995, the previous $10,000 equity credit line with Commonwealth State Bank was replaced by a $30,000 equity credit line in the amount of $30,000 also from Commonwealth State Bank. Adjudication, Finding of fact 55d. As with the previous loans, this commercial line of credit was secured by mortgages against the Paxsons' assets, including the County property, as well as the Zanni Trust property. *Id.* at 55; N.T. 12/2/02 at 59.

¶ 9 On February 21, 1996, the Paxsons obtained a mortgage loan in the amount of $200,000 from Commonwealth State Bank, which was used to refinance and pay off the 1988 $100,000.00 mortgage from New-town Bank, and part of the 1989 $150,000.00 mortgage and 1995 $30,000.00 equity credit line from Commonwealth State Bank. Adjudication, Finding of fact 60; N.T. 12/12/02 at 104. As with prior loans, the February 21, 1996 commercial loan was secured by mortgages against the Paxsons' assets, including the County property, and the Zanni Trust property. Adjudication. Finding of fact 61.

¶ 10 Five days later, on February 26, 1996, the Sumney Tavern business was sold for $635,000.00. Adjudication, Finding of fact 67; N.T. 12/2/02 at 116.[3] The buyers made a down payment of $210,000.00, of which Paxson received one half ($105,000.00). N.T. 12/2/02 at 116–117. Paxson deposited $57,461.78 of that amount into a Janney Montgomery Scott account. N.T. 12/12/02 at 5–6. The remaining $425,000.00 due (one half to Paxson, one half to Azarchi) was paid by the buyers in monthly installments of approximately $4,000.00 per month, concluding in June of 1999. Adjudication, Finding of fact 68; N.T. 12/2/02 at 117–118. As a result of this arrangement, Paxson received a return of principal in the amount of $212,500.00, plus $56,671.08 in interest. N.T. 12/2/02 at 119.

¶ 11 On July 14, 1997, the Paxsons purchased the Farmhouse restaurant for approximately $500,000.00. N.T. 12/2/02 at 128. To do so, they negotiated a $350,000.00 purchase money mortgage loan from the sellers, and obtained a $150,000

---

1991, a check drawn from that account in the amount of $19,998.00 was used by the Paxsons to pay the balance owed on the County property. Adjudication, Finding of fact 148; N.T. 12/2/02 at 73–77.

A second inheritance check to Paula Marie was issued in the amount of $30,300.00 on November 13, 1992. Adjudication, Finding of fact 154; Plaintiffs' Exhibit 5. It was endorsed by Paula Lynn Paxson, and deposited into a joint account held in the Paxsons'

names with Meridian Bank. Adjudication, Findings of fact 157, 161. A third check was issued in the amount of $2031.97 on September 27, 1993. *Id.* at 158; Plaintiffs' Exhibit 6. Paula Marie endorsed the check herself, at John Paxson's instruction, and he took possession of the check. *Id.* at 162–163.

3. The real estate on which the Sumney Tavern was located was retained. N.T. 12/2/02 at 116.

loan and a $50,000 line of credit from Commonwealth State Bank, secured by mortgages against the Zanni Trust property, the County property, and the Farmhouse restaurant . itself. Adjudication, Finding of fact 88; N.T. 12/2/02 at 128–130; N.T. 12/12/02 at 52–53. The Paxsons leased the Farmhouse property to the Paxson Corp., a company owned by Mr. Paxson, which operates the Farmhouse business. Adjudication, Findings of fact 86–87.

¶ 12 In April of 1998, Paxson sold his share of the Sumney Tavern real estate to Azarchi for $125,632.00. Adjudication, Finding of fact 69; N.T. 12/2/02 at 119.

¶ 13 Settlement on the sale of the majority of the Zanni and County properties to Heritage finally occurred on May 7, 1998. Adjudication, Finding of fact 76; N.T. 12/2/02 at 104. The Paxsons used a portion of the proceeds from the sale of to pay off the 1996 mortgage loan from Commonwealth State Bank, and retained the balance. Adjudication, Finding of fact 77. Of the remaining .918 acres retained by the Paxsons (designated Lot 32), one half was originally part of the Zanni Trust property, and the other half was part of the County property. *Id.* at 78–79. At the time of the 1998 settlement, the portion of Lot 32 which was originally part of the Zanni Trust property was titled in the name of the Paxsons as trustees for the Children, while the portion which had been County property was titled in Mrs. Paxson's name individually. *Id.* at 80.

¶ 14 In early April 1999, the Paxsons applied for a $202,500.00 loan from Sovereign Bank. Adjudication, Findings of fact 92, 94. On June 1, 1999, six days before closing on the loan, the Paxsons, as trustees for the Children, and Mrs. Paxson

individually, executed a deed conveying title to Lot 32 to themselves as individuals (the 1999 deed). *Id.* at 112. The deed had the effect of combining the Zanni Trust property and County property portions of Lot 32 into a single parcel, and allowed the Paxsons to qualify for residential as opposed to commercial loans. *Id.* at 122.[4]

¶ 15 On June 7, 1999, settlement on the Sovereign loan occurred. *Id.* at 100; N.T. 12/12/02 at 56. To secure the loan, the Paxsons executed a mortgage in favor of Sovereign Bank against Lot 32. Adjudication, Finding of fact 109. The proceeds of the loan were used as follows: $55,039.56 and $50,007.27, respectively, paid off the 1997 Commonwealth State Bank loan and credit line; $2,000 was used to pay off a judgment in favor of U.S. Food Service; $27,957.39 paid off credit card and other debt; and the remaining $58,018.11 was paid to the Paxsons. *Id.* at 102–106. Sovereign has since sold the loan to Provident Bank. *Id.* at 111. Two months after closing on the loan, the Paxsons separated. *Id.* at 137.

## PROCEDURAL HISTORY

¶ 16 The legal proceedings which are the subject of the appeal currently before us began on March 7, 2000, when the Children filed a "Petition for Removal of Trustees, Accountings, Disgorgement, Injunctive Relief, Surcharges and Damages" (Petition for Removal). Count I of the Petition for Removal contended that the Paxsons had breached the terms of the express trust established for the Children's benefit by the October 14, 1987 deed. Specifically, the Children argued in Count I of the Petition for Removal that their parents wrongly (1) used the

---

**4.** John Paxson specifically testified at trial that his immediate goal in so transferring the property was to put he and his wife in a

position to qualify for a residential rather than commercial loan. N.T. 12/12/02 at 56–57.

Zanni Trust property and Paula Marie's inheritance money as collateral to buy the Sumney Tavern and the Farmhouse restaurant, (2) sold a portion of the Zanni Trust property and used part of the proceeds to satisfy debt related to the Farmhouse restaurant purchase, and (3) conveyed the remainder of the Zanni Trust property to themselves, encumbered it with the Sovereign Bank loan, and used the proceeds for their own, non-trust purposes. As a result of these alleged breaches, the Children asked the lower court to, among other things, (1) remove the Paxsons as trustees and declare constructive and resulting trusts upon the property derived from the trust real estate, including the income from and proceeds of the sale of the Sumney Tavern and the Farmhouse restaurant, and a Janney Montgomery Scott account allegedly containing $160,000.00 from the proceeds of the of the Sovereign Bank mortgage and the sale of the Sumney Tavern, (2) order the Paxsons to satisfy the Sovereign Bank mortgage, and (3) subject the Paxsons to surcharge for mismanagement and for losses to the trust.

¶ 17 Count II of the Petition for Removal asserted that constructive trusts were created by the Paxsons' unlawful and/or fraudulent receipt, possession, conversion and use of Paula Marie's inheritance totaling $52,331.97, including their use of part of her inheritance to purchase the County property, a portion of which was later sold and the proceeds from which were put to the Paxsons' own use. Count II requested that the lower court declare the existence of constructive and resulting trusts as to all monies and properties received by the Paxsons as Paula Marie's inheritance, as well as all property or assets derived by the use or investment thereof and declaring the Paxsons' status as trustees thereof. Upon declaration of their status as trustees, Count II requested that the Paxsons

be removed from that position and be ordered to turn over to Paula Maria all property and assets derived from the use of her inheritance. Count II additionally requested that the Paxsons be surcharged for any mismanagement or loss.

¶ 18 Counts III and IV alleged that the Paxsons were guilty of tortious violation of their fiduciary duties with regard to the Zanni Trust, and Paula Marie's inheritance, for which they should be ordered to pay compensatory and punitive damages.

¶ 19 In addition to the Petition for Removal, the Children also filed a "Petition to Divest Mortgage" (Petition to Divest) against their parents and The Provident Bank, as successor to Sovereign Bank, on November 13, 2001, requesting that the court declare null, void and divested the June 7, 1999 mortgage executed by the Paxsons in favor of Sovereign Bank.

¶ 20 The two petitions were consolidated on February 19, 2002, and testimony was heard by the Orphans' Court Division of the Court of Common Pleas of Bucks County over the course of a seven day trial spread out from September, 2002 until February 2003. At trial, John Paxson asserted, among other things, that the Zanni Trust Deed granted he and his wife a life estate with the right of consumption, empowering them to sell or mortgage the trust property to its depletion, if they so chose. N.T. 12/2/02 at 7–10. The Children argued that the Paxsons were only appointed trustees. N.T. 12/2/02 at 13–15. The Children maintained that the Trust Deed "gave [the Paxsons] the power to do everything they did but not to consume everything they took." *Id.* at 16. Specifically, the Children argued that the Trust Deed granted the Paxsons the power to sell or mortgage the trust property, but not to consume the principal obtained as a result of such sale or mortgage. *Id.* at 16.

¶ 21 Following trial, the Children filed a Notice of Election of Remedies, indicating as follows:

(a) The Petitioners respectfully elect to trace principal into John Paxson's purchase of a 50% interest in Sumney Tavern real estate and business, then through the principal gains derived therefrom into the various accounts of the respondents and thereafter, to the extent traceable to the real estate, business and liquor license of the Farmhouse Tavern.

(b) Petitioners respectfully elect to trace the proceeds of the 1999 mortgage loan from Sovereign Bank into the satisfaction and reduction of the secured liens on the Farmhouse Tavern real estate; and

(c) To the extent the said principal funds are not traced, petitioners respectfully pray that the respondents be subject to money judgment of surcharge and petitioners elect the payment of those principal sums together with prejudgment interest from those respective dates of consumption or commingling to the date of the final entry in this action.

Petitioners' Notice of Election of Remedies filed 4/25/03 at 1.

¶ 22 On May 27, 2003, Judge Daniel Lawler filed a thirty-four page adjudication and order from which the parties now appeal. From the language of the 1987 deed, Judge Lawler concluded that "[i]t is evident that the settler Anthony L. Zanni, M.D. created the trust to provide a family home for his daughter, her husband and their children and to establish an inheritance for his grandchildren." Adjudication, Discussion. Judge Lawler found that the Trust Deed showed that Dr. Zanni clearly intended to name the Paxsons as trustees for their children, but did not intend to grant them a personal interest or estate in the property. *Id.*, Discussion, Conclusion of Law 2. Judge Lawler further acknowledged that the Trust Deed gave the Paxsons the right to occupy the property, or manage, lease and devise it, and to use the rents and other income thereby produced for their own use. *Id.*, Discussion, Conclusion of Law 3. Judge Lawler concluded, however, that the Trust Deed did not give the Paxsons the power to receive or use principal or any increase thereof for their own use. *Id.* Additionally, Judge Lawler found that the Trust Deed gave the Paxsons the power to sell or mortgage the property during the continuance of the trust, but he specifically concluded that they were not permitted by the Trust Deed to use or consume the proceeds realized from such a sale or mortgage, since those proceeds remained as trust assets to be managed for the benefit of the Children. *Id.*, Discussion, Conclusion of Law 4. In conjunction with the power to sell or mortgage, Judge Lawler found that the Trust Deed obligated the Paxsons, as trustees, to see to the application of any purchase or mortgage money for trust purposes, while specifically excusing the purchaser and/or mortgagee from any liability with regard to such application. *Id.*, Discussion, Conclusion of Law 5.

¶ 23 In addition to his conclusions regarding the Paxsons serving as trustees for the Zanni Trust property, Judge Lawler also concluded that the Paxsons acted as constructive trustees with regard to the money Paula Marie inherited from Dr. Zanni. *Id.*, Discussion.

¶ 24 Based on the evidence presented to him, Judge Lawler then made the following specific findings:

6. On May 7, 1998, the Paxsons conveyed to Heritage 4.60 acres of land designated as Sub–Area "B" on Exhibit P–48 an asset of the Zanni Trust and

unlawfully converted to their own use the proceeds of the sale. $174,230.

7. On May 7, 1998, the Paxsons conveyed to Heritage 4.64 acres of land designated as Sub–Area "A" on Exhibit P–48 an asset purchased with money, 89% of which came from the first partial payment of the inheritance of Paula Marie Paxson and unlawfully converted to their own use the proceeds of the sale. $175,770.

8. On June 1999, the Paxsons unlawfully conveyed title to tax map parcel 51–10–27, Lot 32, the sole remaining asset of the Zanni Trust to themselves individually, obtained a mortgage loan of $202,500 from Sovereign Bank and converted to their own use the proceeds of the mortgage loan.

9. On or about November 13, 1992, the Paxsons received the sum of $30,000.00 representing a second partial payment of the inheritance of Paula Marie Paxson and unlawfully converted the moneys to their own use.

10. On or about September 27, 1993 the Paxsons received the sum of $2,031.97 representing a third partial payment of the inheritance of Paula Marie Paxson and unlawfully converted the moneys to their own use.

11. The Mortgage dated June 7, 1999 between Provident Bank d/b/a PCFS Financial Services, Inc., successor to Sovereign Bank and John Paxson and Paula Lynn Paxson is neither null nor void and shall not be divested.

12 The Zanni Trust is terminated because the original purpose of the conveyor Anthony L. Zanni, M.D. can not be carried out and/or is impractical of fulfillment due to:

a. the self-dealing with and the commingling of assets by the trustees John and Paula Lynn Paxson;

b. the separation and divorce of the trustees and the antagonistic and tumultuous breakup of their family.

*Id.*, Conclusions of Law 6–12.

¶ 25 Based on his findings and conclusions, Judge Lawler issued the following order:

1. John Paxson and Paula Lynn Paxson shall convey to Paula Marie Paxson, Rebecca Paxson, Robert A. Paxson and Justin Paxson, as tenants in common, all that certain tract, piece or parcel of land situate in the Township of Warwick, County of Bucks, Commonwealth of Pennsylvania know as 1759 School Road, being tax map parcel No. 51–10–27 and described in Deed Book 848, page 2256, et seq. consisting of .918 acres under and subject to a certain mortgage given to Sovereign Bank on June 7, 1999 in the amount of $202,500 and recorded in Book 1868 page 0637–0645.

2. Judgment in entered in favor of Paula Marie Paxson, Rebecca Paxson, Robert A. Paxson and Justin Paxson against John Paxson and Paula Lynn Paxson jointly and severally for the proceeds of the Heritage sale and interest shall be added thereon at the rate of 6% from May 7, 1998 until the date of payment on the amount of $174,230.00.

3. Judgment in entered in favor of Paula Marie Paxson against John Paxson and Paula Lynn Paxson jointly and severally for the proceeds of the Heritage sale and interest shall be added thereon at the rate of 6% from May 7, 1998 until the date of payment in the amount of $175,770.00.

4. Judgment in entered in favor of Paula Marie Paxson against John Paxson and Paula Lynn Paxson jointly and severally for the inheritance payment received on November 13, 1992 and interest shall be added thereon at the rate of 6% from November 13, 1992 until the

date of payment on the amount of $30,300.00.

5. Judgment is entered in favor of Paula Marie Paxson against John Paxson and Paula Lynn Paxson jointly and severally for the inheritance payment received on September 27, 1993 and interest shall be added thereon at the rate of 6% from September 27, 1993 until the date of payment on the amount of $2,031.97.

6. Judgment in entered in favor of Paula Marie Paxson, Rebecca Paxson, Robert A. Paxson and Justin Paxson against John Paxson and Paula Lynn Paxson jointly and severally for the proceeds of the Sovereign Bank mortgage of $205,000, less credit for improvement to the real estate of $125,000.00 for the amount of $80,000.00.[5]

7. The Petition to Divest Mortgage of Sovereign Bank is DENIED and DISMISSED.

Order dated and filed 5/27/03. The Children have appealed the May 27, 2003 Adjudication,[6] and John Paxson has cross appealed.[7]

## DISCUSSION AND CONCLUSIONS

¶ 26 The parties have raised numerous, complicated claims, and have generally done a poor job of presenting them with any clarity.[8] Their inability to clearly

---

5. Although Judge Lawler otherwise correctly references the Sovereign mortgage as being in the amount of $202,500.00, the Order indicates its amount as $205,000.00, and subtracts the $125,000.00 cost of improvement from that figure to arrive at the $80,000.00 awarded to the Children. Assuming that the $125,000.00 was correctly deducted, the award should have been $77,500.00. None of the parties has contested the $80,000.00 figure on appeal, however.

6. Despite the consolidation of their Petition for Removal and Petition to Divest Mortgage at the trial level, the Children filed a separate appeal of the May 27, 2003 order as it relates to the Petition to Divest, and that appeal is addressed separately.

7. The Children did not file post-trial motions but none were needed in order to preserve their claims. *See In re Estate of Rosser*, 821 A.2d 615 (Pa.Super.2003); Pa.O.C.R. 7.1. The trial court did not order a Pa.R.A.P. 1925(b) statement; however, the Paxson sisters filed such a statement. The trial court has since filed a Pa.R.A.P. 1925(a) opinion.

8. The Children raise the following four issues on appeal:

1. Whether the court committed error of law and abused its discretion in not holding the parents liable for all amounts of the children's principal commingled and/or invested by their parents?

2. Whether the court committed error of law and abused its discretion in not tracing the capital gains derived by the parents commingling and self-dealing in the children's principal, and failing to impose constructive trusts consistent with such tracing?

3. Whether the court committed error of law and abused its discretion in giving a $125,000 credit to the parents for alleged improvements to the Zanni house, under evidence not admissible under applicable law, without proof of the respondents' contribution thereto, contrary to positive law, and admittedly made with the children's own money?

4. Whether the court committed error of law and abused its discretion by declining to adopt the election of remedies made by the beneficiaries with respect to the tracing of trust principal versus the entry of a money judgment, and by not imposing a constructive trust upon the whole of the Farmhouse's and Paxson Corp.'s assets?

Appellant's *Paxson Trust I* brief at 4. John Paxson's cross appeal raises five allegations:

1. Did the Chancellor wrongfully terminate the life estates?

2. Did the trustees engage in self dealing to justify the termination of the trust?

3. Are the trustees liable to be surcharged?

4. Did the Chancellor properly deny the elections of remedies by the beneficiaries?

5. Did the Chancellor fail to apply the doctrine of laches and the statute of limitations?

John Paxson's brief at 1. Paula Lynn Paxson also filed a cross appeal, but she has failed to

point to what law supports their various claims likely stems, at least in part, from the admitted dearth of truly applicable cases. Regrettably, Judge Lawler's Adjudication and Rule 1925(a) opinion do little to aid in untangling this mess.

¶ 27 We summarize the parties' dispute as follows: John Paxson believes that his father in law put the property in trust for the benefit of his daughter and Paxson, her spouse, and that their children were only incidental beneficiaries if any of the property remained at the Paxsons' deaths. As such, Paxson argues that he and Paula Lynn were entitled to use the property as they saw fit, even to the point of total consumption. Under this scenario, the Paxsons did not misuse the property, owe their children nothing, and were wrongly divested of their interests. The Children, on the other hand, argue that their parents were only trustees, obligated by their position to act on behalf of the beneficiaries of the Trust. Therefore, the Children argue, any benefit that the Paxsons took for themselves was a misuse of their power, for which they must now account.

 ¶ 28 Untangling the facts and attempting to apply the correct law has been a monumental task, but in the final analysis, we are constrained to conclude that Judge Lawler has erred in several crucial respects. Before addressing the specific challenges to Judge Lawler's decision, we note that we do so under the following standard of review:

> The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of eviden-

tiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

*In re Estate of Cherwinski,* 2004 PA Super 305, 856 A.2d 165, 167 (Pa.Super.2004). When the trial court has come to a conclusion through the exercise of its discretion, the party complaining on appeal has a heavy burden. *Paden v. Baker Concrete Construction, Inc.,* 540 Pa. 409, 412, 658 A.2d 341, 343 (1995). "It is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power." *Id.* "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence [of] record, discretion is abused." *Id.* A conclusion or judgment constitutes an abuse of discretion if it is so lacking in support as to be clearly erroneous. *Id.*

We are not constrained to give the same level of deference to the orphans' court's resulting legal conclusions as we

file a brief before this Court, and thus has waived all appellate claims. *Verholek v. Ver-* *holek,* 741 A.2d 792, 794 n. 1 (Pa.Super.1999).

are to its credibility determinations. *Estate of Harrison,* [745 A.2d 676, 678 (Pa.Super.2000) ]. We will reverse any decree based on "palpably wrong or clearly inapplicable" rules of law. *Horner by Peoples National Bank of Central Pennsylvania v. Horner,* 719 A.2d 1101, 1103 (Pa.Super.1998). Moreover, we are not bound by the chancellor's findings of fact if there has been an abuse of discretion, a capricious disregard of evidence, or a lack of evidentiary support on the record. *Id.* If the lack of evidentiary support is apparent, "reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law." *Id.* (quoting *Union Trust Company of New Castle v. Cwynar,* 388 Pa. 644, 649, 131 A.2d 133, 135 (1957)). Nevertheless, we will not lightly find reversible error and will reverse an orphans' court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported

by the record. *Estate of Harrison,* 745 A.2d at 681.

*In re Stella Scheidmantel; Appeal of Trustee Sky Trust,* 868 A.2d 464, 478–479 (Pa.Super.2005). With this standard in mind, we first turn to John Paxson's claim that the Zanni Trust Deed granted the Paxsons life estates with powers of consumption.

 ¶ 29 Paxson argues that Judge Lawler "in ignoring the settlor's intent and interpreting the terms of the Deed in Trust, made two (2) distinct errors of law: first, in finding that the Paxsons did not possess the right to consumption of the Trust Property and, second in fashioning a remedy which terminated the Trust and extinguished the life estate of the Paxsons." John Paxson's brief at 10.[9] The Children counter that the Trust deed did not identify their parents as "life tenants" and did not grant them a life estate. Children's reply brief at 4.[10] They urge us to look to the language of the Trust deed:

---

9. Paxson argues in the alternative, that if we agree with Judge Lawler's decision to terminate the Trust, the Paxsons, as life tenants, are entitled to fair value for their life estates. John Paxson's brief at 11 (*citing In re Pew's Trust Estate,* 411 Pa. 96, 191 A.2d 399 (1963), *overruled on other grounds by Estate of Tyler,* 474 Pa. 148, 377 A.2d 157 (1977)); *In re Hirsh's Estate* 334 Pa. 172, 5 A.2d 160 (1939); *In re Blish Trust,* 350 Pa. 311, 38 A.2d 9 (1944).

10. We note that when the Children filed their Petition for Removal on March 7, 2000, they specifically admitted that:

> On October 14, 1987, the petitioners' maternal grandfather, Anthony L. Zanni, conveyed certain real estate in Warwick Township, containing the home where petitioners reside, to the respondents **as life tenants and as trustees** for the petitioners as to the remainder, under terms set forth in the Deed, a true and correct copy of which is attached hereto an [sic] marked as Exhibit "B" (hereinafter referred to as the "Trust").

Petition for Removal filed 3/7/00 at 7 (emphasis added). This admission was also contained in the Children's November 13, 2001 Petition to Divest Mortgage. By the time trial commenced, however, the Children disagreed that such an estate was created. N.T. 12/2/02 at 13–15.

The Children are not bound by their pleadings statements that the Paxsons possessed a life estate, however. While "[a]dmissions . . . contained in pleadings, stipulations, and the like, are usually termed 'judicial admissions' and as such cannot later be contradicted by the party who made them," conclusions of law contained in pleadings are not treated as admissions of facts in issue. *Silco Vending Company v. Quinn,* 315 Pa.Super. 367, 461 A.2d 1324, 1326 (1983) (*citing Tops Apparel Manufacturing Co. v. Rothman,* 430 Pa. 583, 587, 244 A.2d 436, 438 (1968); *Srednick v. Sylak,* 343 Pa. 486, 492–93, 23 A.2d 333, 337 (1942)). In the instant case, the Children's pre-trial characterization of the Paxsons as life tenants is a conclusion of law, and, therefore will not be treated as judicial admission.

The Chancellor's construction of the Trust instrument is well founded upon its clear and unambiguous language. The Deed of Trust did not grant an estate to the parents as life tenants. Rather, it simply named the parents as trustees, with certain rights of consumption, including the right to reside in the premises for life, "IN TRUST NEVERTHELESS". The Deed of Trust was explicit that the trustees right to occupy the premises was under and subject to the several provisos, restrictions limitation and condition imposed by the Deed of Trust. Their powers were only coextensive with or "during the continuance of said Trust". The creator's language reflects the recognition that the Trust could be terminated before the trustees' deaths, such as by their unfaithful conduct as fiduciaries.

*Id.*

■ ¶ 30 Thus, we must determine if the Trust Deed granted the Paxsons life estates in addition to appointing them as trustees, and, if such estates were granted, whether they included a power of consumption. We first address the question of whether life estates were created. After careful review of the language used in the Trust Deed, and extensive research of applicable case law, we conclude that the Trust Deed did grant John and Paula Lynn Paxson life estates. The veracity of this decision is clear when the Paxsons' role as trustees is viewed independently from their status as life tenants.

¶ 31 As we noted above, the Trust Deed was worded in pertinent part as follows:

IN TRUST NEVERTHELESS for the following uses, intents, and purposes and UNDER AND SUBJECT to the several provisos, restrictions, limitations, and conditions following, that is to say, the said John Paxson and Paula Lynn Paxson, **Trustees**, their successors and assigns, shall manage, let and demise and take and receive the rents, issues and profits thereout all taxes and charges, **to pay the net rents issues and profits unto the said John Paxson and Paula Lynn Paxson for their sole and separate use, for an [sic] during the term of their natural life, or to suffer and permit the said John Paxson and Paula Lynn Paxson to occupy the said premises, they the said John Paxson and Paula Lynn Paxson to pay all taxes and charges on the hereby granted premises and make all necessary and proper repairs thereof, AND** immediately upon the death of the said John Paxson and Paula Lynn Paxson, then the said premises shall vest in their children, absolutely and in fee simple, free, clear and NEVERTHELESS, that it shall and may be lawful for the said John Paxson and Paula Lynn Paxson, **Trustees**, as aforesaid, at any time during the continuance of said Trust, to Sell and dispose of the said premises hereby granted, or any part thereof, or to mortgage the said premises or any part thereof, and by proper deed or deeds, conveyance, mortgage or mortgages, or assurances in the law, to grant, convey mortgage, assure the same to the Purchaser or Purchasers, mortgagee or mortgagees thereof, without any liability on the part of such purchaser or purchasers, mortgagee or mortgagees to see to the application of the purchase or mortgage money. Notwithstanding anything herein to the contrary the **Trustees** therefore and hereby do not have the power to grant and convey the subject premises by Deed in lieu of foreclosure.

Trust Deed dated 10/14/87 (emphasis added).

¶ 32 When naming the Paxsons, the Zanni Trust deed very clearly uses or omits

the title "Trustees," depending on the circumstance. The deed first states that the Paxsons, in their role as trustees ("John and Paula Lynn Paxson, Trustees"), shall "manage, let and demise and take and receive the rents, issues and profits" from the property. It then directs that they fulfill this duty as trustees in order to pay the rents, issues and profits to themselves in their personal, non-trustee capacity ("John and Paula Lynn Paxson"). The Trust continues that, in the alternative, the Paxsons, in their personal capacity ("John and Paula Lynn Paxson"), may occupy the premises. The deed then specifies that upon the death of the Paxsons, in their personal capacity ("John and Paula Lynn Paxson"), the premises will vest in the Children. Finally, the deed indicates that nevertheless, the Paxsons, in their capacity as trustees ("John and Paula Lynn Paxson, Trustees") may sell, dispose of, or mortgage the premises. Thus, is it clear that the Zanni Trust Deed distinguished between the Paxsons' status as trustees and their status in their personal capacity as beneficiaries of the trust. Further, we find that the wording of the Trust Deed establishes that the Paxsons' non-trustee personal capacities were as life tenants.

¶ 33 "A 'life estate' is defined as 'an estate whose duration is limited to the life of the party holding it, or some other person.'" *Estate of Kinert v. Dept. of Revenue*, 693 A.2d 643, 645 (Pa.Cmwlth. 1997) (*citing* Black's Law Dictionary 924 (6th ed.1990)).

A life estate arises when a conveyance or will expressly limits the duration of the created estate in terms of the life or lives of one or more persons, or when the will or instrument creating the interest, viewed as a whole, manifests the intent of the transferor to create an estate measured by the life or lives of one or more persons. Cornelius J. Moynihan, Introduction to the Law of Real Property, Chapter 2, § 10 (1962); see also Ladner on Conveyancing in Pennsylvania § 1.03(b) (Timothy J. O'Neill 4th ed.1988). A life estate has the quality of alienability, thus the life estate can be conveyed to a third person; but, the life estate holder can not convey a greater interest than he/she possesses. Generally, the life estate holder is responsible for interest on any mortgage on the property, and has a duty to pay current taxes and assessments, by a municipality or other public authority, which do not exceed the probable duration of the life estate. Moynihan; Ladner.

*Estate of Hewitt,* 554 Pa. 486, 495, 721 A.2d 1082, 1086 (1998) (Concurrence by Justice Cappy). Additionally, a life estate holder may serve as trustee. *Johnson Estate,* 359 Pa. 645, 647, 59 A.2d 877, 878–879 (1948); *Preston v. Preston,* 202 Pa. 515, 52 A. 192 (1902); *Estate of Rider,* 711 A.2d 1018 (Pa.Super.1998); *Gilda Estate,* 54 Pa. D. & C.2d 455 (Pa. Common Pleas 1972).[11] Finally, "the use of any particular phrases or words of art is not required in order to create or reserve a life estate." *In re Appeal of Board of School Directors of Owen J. Roberts School Dist.* 500 Pa. 465, 470, 457 A.2d 1264, 1266, (1983) (*citing Cheroka v. Tobolski,* 151 Pa.Super. 238, 30 A.2d 152 (1943), Restatement of the Law of Property § 107, Comment (e) (1936)).

¶ 34 The courts of Pennsylvania have determined that language such as that used in the Zanni Trust deed creates a life estate. Language very similar to the phrases used in the Zanni Trust deed appeared in *Bacon's Estate,* 202 Pa. 535, 52

11. We note that while we are not bound by decisions of the lower court, we have found several such decisions persuasive, and have cited to them accordingly.

A. 135 (1902). There, Bacon conveyed real estate in trust to his five nieces. The trust deed contained the following provision:

> **In trust nevertheless** to **let and demise** the same and collect and receive the **rents and issue and profits** thereof and after deducting the taxes, repairs and the necessary expenses of this trust, to pay over half yearly the sum of Six hundred dollars per annum (if the income of said property will realize said sum and if not then so much thereof as the same will produce ratably and in proportion) to the **sole and separate use** of each of my five nieces ... **for and during the term of the natural life of each** of my said five nieces....

*Bacon's Estate,* 202 Pa. at 537, 52 A. at 136 (emphasis added). The Court concluded that this language created a life estate in each of the nieces. *Id.*

¶ 35 The term "for and during the term of his/her natural life" has been deemed to create a life estate in conjunction with other phrases as well. In *Linn Estate,* the Pennsylvania Supreme Court concluded that a life estate was created by the following language:

> I give, devise and bequeath all my estate, real, personal and mixed ... to my husband, Jacob C. Linn, if he shall survive me, to take, hold, control and use the same **for and during the term of his natural life** ... ..... Upon the decease of my said husband ... I give, devise and bequeath my estate, real, personal and mixed, which may then remain, to the children of my deceased brother.

*Linn Estate,* 435 Pa. 598, 600, 258 A.2d 645, 646 (1969) (emphasis added). Similarly, in *Moltrup Estate,* the following wording created a life estate:

> All the rest, residue and remainder of my estate ... I give, devise, and bequeath to my wife, Mary E. Moltrup, **for and during the term of her natural life** ....
>
> . . .
>
> Upon the death of my wife, Mary E. Moltrup, I give, devise and bequeath all the rest, residue and remainder of my estate ... to my son ....

*Moltrup Estate,* 424 Pa. 161, 164, 225 A.2d 676, 677 (1967) (emphasis added).

¶ 36 In *Johnson Estate,* a husband's will appointed his wife trustee and gave her a life estate by the use of the following language:

> All the residue of my estate real, personal and mixed of every kind and wherever situate, I give, devise and bequeath to my wife, Georgia P. Johnson, and to her heirs and assigns forever, **in trust however** to hold, manage and collect the income from said estate care for, distribute and use the same and so much of the principal of said estate as in her judgment it may be wise to use for the benefit of herself **during her natural life** and for the benefit of our children . . . .
>
> . . .
>
> I also give, bequeath and devise all my residuary estate ... to our surviving children absolutely in equal shares, or to our surviving child should only one survive us ....

*Johnson Estate,* 359 Pa. at 647, 59 A.2d at 878–879 (emphasis added). *See also English's Estate,* 270 Pa. 1, 112 A. 913 (1921); *Frisbie's Estate,* 266 Pa. 574, 109 A. 663 (1920); *LaRosa v. McVicker,* 185 Pa.Super. 95, 137 A.2d 861 (1958). Thus we find that the Zanni Trust Deed's use of the language "for and during the term of their natural life" granted John and Paula Lynn Paxson life estates.

¶ 37 Paxson urges us to further conclude that the life estates included powers of consumption.

A variation on the life estate is a "life estate with the power of consumption." Here, the donee has the power not only to enjoy the property during his lifetime, but also to dispose of all or part or the property without regard to the future rights of the remaindermen. *Degenkolv v. Daube*, 143 Pa.Super. 579, 18 A.2d 464, 466 (1941).

*Estate of Rider*, 711 A.2d at 1021. Although a life tenant may be granted a power of consumption, we find that the language necessary to accomplish such a grant is not present in the Zanni Trust Deed. In *Linn Estate*, a will gave the life tenant a power of consumption by employing the following language:

> [I give my estate to my husband for and during the term of his natural life], and during said term to use and expend all of the income from said estate as he may desire, and further to use, convert and expend so much of the principal of said estate as he may find necessary in order to provide him a comfortable and satisfactory support.

*Linn Estate*, 435 Pa. at 600, 258 A.2d at 646. In *Moltrup Estate*, the life estate holder was granted a power of consumption by the following words:

> All the rest, residue and remainder of my estate ... I give, devise, and bequeath to my wife, Mary E. Moltrup, for and during the term of her natural life, **with full power of consumption of both principal and income, and with the right of sale of real estate of which I may die possessed** ...

*Moltrup Estate*, 424 Pa. at 164, 225 A.2d at 677 (emphasis added). In *Johnson Estate*, the husband's will gave his wife a life estate with power of consumption by using the following language:

> [I give my estate to my wife], in trust however to hold, manage and collect the income from said estate care for, distrib-

ute and use the same and so much of the principal of said estate as in her judgment it may be wise to use for the benefit of herself during her natural life and for the benefit of our children ....

*Johnson Estate*, 359 Pa. at 647, 59 A.2d at 878–879. In *Gilda Estate* a life estate holder was granted a power of consumption by the testator's will, which provided:

> During her lifetime [she] shall be entitled to receive the entire income from my estate and to pay to herself such portion of the principal of my estate as she may require in her sole discretion for her support and maintenance and for use in case of illness or other necessity.

*Gilda Estate*, 54 Pa. D & C.2d at 455–456. There the court determined that it was "clear that testatrix intended to give her daughter a life estate with a wide power of consumption of the entire principal estate...." *Id.* In contrast, the will in *Smith's Estate* employed language establishing a life estate without the power of consumption, but gave the trustees the power to sell the trust property as follows:

> SIXTH: All the rest, residue and remainder of my estate, real personal and mixed of whatsoever kind or nature, or from whomsoever inherited, I give, devise and bequeath unto The Real Estate Trust Company of Philadelphia, in Trust Nevertheless to keep the same invested in good and safe securities (but without restriction to what are known as legal investments), with power to change said investments at discretion, to square, exchange, sell or buy real estate without obligation upon the purchaser to see to or be responsible for the application of the purchase money, and the income thereof to collect and pay over at convenient times as follows: the income of said residuary estate shall be paid to my wife Gertrude Meryweather Smith for and during the term of her natural life.

*Smith's Estate,* 314 Pa. 437, 439, 171 A. 587, 588 (1934).

¶ 38 In the case at hand, Paxson cites to the following wording contained in the Zanni Trust Deed to support his claim that a power of consumption was granted:

> NEVERTHELESS, that it shall and may be lawful for the said John Paxson and Paula Lynn Paxson, Trustees, as aforesaid, at any time during the continuance of said Trust, to Sell and dispose of the said premises hereby granted, or any part thereof, or to mortgage the said premises or any part thereof, and by proper deed or deeds, conveyance, mortgage or mortgages, or assurances in the law, to grant, convey mortgage, assure the same to the Purchaser or Purchasers, mortgagee or mortgagees thereof, without any liability on the part of such purchaser or purchasers, mortgagee or mortgagees to see to the application of the purchase or mortgage money.

Trust Deed 10/14/87. Paxson argues this language empowered him to sell or mortgage the Trust property even to the point of complete depletion, and to use the proceeds of such a sale or mortgage. John Paxson's brief at 10–12. We agree that the Trust Deed allowed the Paxsons to sell or mortgage the property, but disagree that such an entitlement amounted to a power of consumption.

¶ 39 As we previously noted, the Trust deed addressed the Paxsons in two separate capacities: first as trustees and second as life estate holders. The passage cited by Paxson above clearly grants the Paxsons the power to sell, mortgage, or otherwise dispose of the premises **in their capacity as trustees**, not in their capacity as life tenants. Thus, the Trust Deed granted the Paxsons, as trustees, the power to mortgage the property, but did not grant them life estates with the power to dispose of all or part or the property without regard to the future rights of the remaindermen.

¶ 40 Based on the above, we find that the life estates granted by the Zanni Trust Deed empowered the Paxsons to occupy the trust property, or rent it out and take the profits, but not to sell or mortgage it. The power to sell or mortgage was given to the Paxsons only in their capacity as **trustees for the Children**. Based on our conclusion that John and Paula Lynn Paxson were granted life estates by the Zanni Trust Deed, we find that Judge Lawler erred in his conclusion that the Trust Deed did not grant the Paxsons a "personal interest or estate." Adjudication, Conclusions of Law 2.

¶ 41 Although not acknowledge by Judge Lawler, the Paxsons' life estates were nonetheless effectively extinguished by his termination of the Trust, and a remedy is now necessary. As we will discuss, we agree that termination of the Trust was proper. Since the life estates sprang from and were governed by the Trust, however, its absence makes reinstatement of the life estates impossible. The alternative remedy is to reimburse the Paxsons for the value of the life estates. John Paxson asserts that he presented unrefuted expert testimony at trial that the Paxsons' life estates were worth $500,000.00. John Paxson's brief at 11. A review of this testimony, however, reveals that Paxson's expert was only able to provide this figure as an estimate, and specifically explained that he would need to "do some analysis in order to define it further." N.T. 1/2/03 at 165. We thus remand to the lower court to allow it to determine the value of the Paxson's life estates. To do so, it may consider any appropriate evidence already admitted, request any additional evidence it desires, and hold further hearings as it sees fit.

¶ 42 Having concluded that the Paxsons were granted life estates but no powers of consumption, we turn next to the Children's various claims. Three of the four claims raised by the Children center around the Paxsons' actions in repeatedly mortgaging the trust property. As we explained above, the Trust deed gave the Paxsons the power to mortgage the Trust property, in their capacity as trustees. Case law makes it clear, however, that trustees must act in favor of the beneficiaries of the trust. As such, if the Paxsons exercised the power to mortgage the Trust property, their position as trustees obligated them to use the proceeds not to their own advantage, but to the advantage of the beneficiaries of the Trust. *Estate of McCredy*, 323 Pa.Super. 268, 470 A.2d 585 (1983).

> In general, "[t]he trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." The rule prohibits both self-dealing and conflicts of interest. Thus, the trustee must neither 1) deal with trust property for the benefit of himself or third parties, nor 2) place himself in a position

inconsistent with the interests of the trust.

*Id,* 470 A.2d at 597 (*citing* Restatement, *supra,* § 170(1); 39 P.L.E. *Trusts* § 185–186 (1961)). The Children aver that the Paxsons breached their duties as trustees by using the proceeds of the loans for their own benefit.

¶ 43 Specifically, the Children first ask us to determine "[w]hether the court committed error of law and abused its discretion in not holding the parents liable for all amounts of the children's principal commingled and/or invested by their parents." Children's brief at 4.[12] The crux of this claim is that the money derived by using Trust property as collateral should be considered part of the principal of the Trust, to which the Children, as beneficiaries, are entitled.[13] The Children point to the loans obtained by the Paxsons from 1988 through 1999 in support of their assertion that Judge Lawler erred in refusing to surcharge the Paxsons $338,035.39 (jointly), and John Paxson $184,964.97 (individually), as described by the Children in the appendices attached to their brief.[14] *Id.* at

12. The corresponding argument section of the Children's brief rewords the claim as follows: "The court committed error of law and abused its discretion by not requiring the parents to repay all of the childrens' [sic] principal proven to have been co-mingled and subject of self-dealing." Children's brief at 14.

13. The Children provide no authority to support their claim that the proceeds of a mortgage partially secured by the use of trust property as collateral constitute principal as opposed to income. Our extensive research has failed to discover a case involving this situation. The Children cite instead to case establishing that if trust property is sold for profit, the profit is principal. Selling property at a profit seems quite distinguishable from encumbering property with a mortgage, but this distinction is not determinative of our final conclusion here.

14. Through Appendix H, the Children argue that the Paxsons should have been surcharged for their use of (1) $100,000.00 from the January 11, 1988 loan [We note that this amount appears to be incorrect, as the individual amounts listed add up to only $95,642.00], (2) $10,000.00 from the June 26, 1989 credit line, (3) $30,000.00 from the May 12, 1995 credit line, (4) $42,029.47 from the February 21, 1996 loan, (5) $65,632.00 from the April 1, 1998 sale of the Sumney Tavern real estate, and (6) $90,373.92 from the June 7, 1999 loan.

Through Appendix I, the Children argue that John Paxson should have been surcharged for his use of money related to the February 26, 1996 sale of the Sumney Tavern business, including (1) $47,538.22 from the down payment received at the time of sale, (2) $51,003.32 in principal payments received from the February 1996 through May 1999, and (3) $612.64 from the June 1, 1999 note payoff.

16–17. None of the parties involved, including Judge Lawler, has adequately addressed the law of surcharging, or the applicability of a surcharge to the facts at hand. The uncertain state of the law itself, coupled with the complete absence of cases with a fact pattern such as that currently before us, undoubtedly contributed to their less than stellar showing.

¶ 44 Even this Court's extensive research on the issue makes only a few things clear. At its basic level, a surcharge is something imposed on a fiduciary, such as a trustee, when the fiduciary has breached his or her duties. Some cases indicate that a surcharge is imposed to compensate for a loss caused by the fiduciary. *In re Scheidmantel*, 868 A.2d at 492 (*citing Estate of Scharlach*, 809 A.2d 376, 384 (Pa.Super.2002)) ("A surcharge is the equitable penalty imposed when a trustee fails to exercise the requisite standard of care and the trust suffers thereby."). *See also In re Trust of Munro*, 373 Pa.Super. 448, 541 A.2d 756, 758 (1988) (*citing Estate of Stephenson*, 469 Pa. 128, 138, 364 A.2d 1301, 1306 (1976)) ("A surcharge is the penalty imposed for failure of a trustee to exercise common prudence, skill and caution in the performance of its fiduciary duties and is imposed to compensate beneficiaries for the loss caused by the fiduciary's want of due care.").[15]

¶ 45 A panel of this Court specifically noted in the case *In re McGillick Foundation*, 406 Pa.Super. 249, 594 A.2d 322

Through Appendix I the Children also assert that John Paxson should be surcharged for $85,810.79 disbursed from his Janney Montgomery Scott account from April 1996 through March 2001. Appendix J breaks down the $85,810.79 sum into individual disbursement amounts.

Although the Appendices were not introduced at trial, the factual data contained in them is generally supported with citations to the trial record.

(1991), *affirmed in part and reversed in part on other grounds*, 537 Pa. 194, 642 A.2d 467 (1994), that "[t]he purpose of a surcharge is reimbursement for losses, not punishment of the fiduciary guilty of nonfeasance." *Id.*, 594 A.2d at 331 (*citing Freedman Estate*, 1 Pa.Fiduc.Rep.2d 60, 68 (Alleg.Co.1980) *aff'd.*, 307 Pa.Super. 413, 453 A.2d 651 (1982)).[16] In previous cases, however, the reverse was found—a surcharge was viewed not as compensation for any possible loss, but as punishment for the fiduciary's improper conduct.

¶ 46 In *Bane's Estate*, 452 Pa. 388, 305 A.2d 723 (1973), for example, the Pennsylvania Supreme Court explained that:

'It matters not that there was no fraud meditated and no injury done; *the rule [forbidding self-dealing ] is not intended to be remedial of actual wrong, but preventive of the possibility of it.*' [*Noonan Estate*, 361 Pa. 26, 32, 63 A.2d 80, 84 (1949)] (emphasis added). See also *Comerford Estate*, 388 Pa. 278, 130 A.2d 458 (1957); Restatement, Second, Trusts § 170 (1959).

*Banes Estate*, 452 Pa. at 396, 305 A.2d at 727. The principle espoused in *Banes* was later cited approvingly in *Estate of McCredy, supra*. Most recently, in *Estate of Harrison, supra*, a panel of this Court imposed a surcharge for self-dealing and explained as follows:

[A] finding of prohibited self-dealing need not be premised on a showing of loss to the estate:

15. *Scheidmantel* involved the actions of a trustee. *Scharlach* involved the actions of the guardian of the estate of an incapacitated person. *Trust of Munro* involved the actions of a trustee. *Stephenson Estate* involved the actions of an executor.

16. *McGillick* involved the actions of a trustee.

The test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in a material connection ... *The fiduciary's disqualifying interest need not be such as 'did affect his judgment' but merely such as 'might affect his judgment.'*

[*Noonan Estate*, 361 Pa. at 31, 63 A.2d at 84] (quoting *In re Downing's Estate*, 162 Pa.Super. 354, 57 A.2d 710, 712 (Pa.Super.1948)). *See also Eagan v. Jackson*, 855 F.Supp. 765, 779 (1994) ("It is unnecessary to show that the fiduciary succumbed to this temptation, that he acted in bad faith, that he gained an advantage, fair or unfair, [or] that the beneficiary was harmed .... The fiduciary is punished for allowing himself to be placed in a position of conflicting interests in order to discourage such conduct in the future."). If the record substantiates a finding of self-dealing, the executor may be properly surcharged for any amount he accepted in violation of his fiduciary duty. *Eagan*, 855 F.Supp. at 791–92.

*Estate of Harrison*, 745 A.2d at 679 (emphasis in original).

 ¶ 47 For the purposes of resolving the appeal currently before us, however, it is not necessary to settle the question whether a surcharge is purely a punishment or meant to compensate for a loss. Here, it can and should do both, and we find that Judge Lawler erred in failing to order a surcharge against the Paxsons.

 ¶ 48 In reaching this conclusion we need only focus on the fact that John and Paula Lynn Paxson reaped a personal benefit from their actions. This they do not deny, nor does Judge Lawler disagree.[17] It is clear from the record· that the Paxsons, in their capacity as trustees, profited from their unauthorized use of trust property, all the while exposing the Trust to the possibility of foreclosure. Such actions were unmistakably contrary to their positions as trustees. *Estate of McCredy, supra.*

> In general, "[t]he trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." The rule prohibits both self-dealing and conflicts of interest. Thus, the trustee must neither 1) deal with trust property for the benefit of himself or third parties, nor 2) place himself in a position inconsistent with the interests of the trust.

*Id*, 470 A.2d at 597 (*citing* Restatement, *supra*, § 170(1); 39 P.L.E. *Trusts* § 185–186 (1961)). "[A] trustee is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it." *Raybold v. Raybold*, 20 Pa. 308, 311–312 (1853) (*citing* 1 *Equity Jurisprudence*, § 322). *See also Comerford Estate*, 388 Pa. at 294, 130 A.2d at 466 (*citing Steele Estate*, 377 Pa. 250, 257, 103 A.2d 409); *In*

---

17. Judge Lawler explicitly acknowledges that proceeds of the loans, "partially secured by Trust Property, were used by the Paxsons for both **personal and business purposes unrelated to the Trust.**" Rule 1925(a) Opinion at 5 (emphasis added). He specifically states that the June 26, 1989 $10,000.00 equity credit line was used for personal and business purposes, as was the May 12, 1995 $30,000.00 equity credit line. *Id.* In addition, Judge Lawler acknowledges that the September 7, 1989 $150,000.00 mortgage was used to purchase the Sumney Tavern (a non-trust use), and that the February 21, 1996 $200,000.00 mortgage was in part put to non-trust purposes. *Id.* Further, Judge Lawler notes that the $150,000.00 loan and $50,000.00 line of credit from Commonwealth Bank were used to purchase and renovate the Farmhouse Tavern (a non-trust use). *Id.* at 6.

re: *Union Real Estate Inv. Co.,* 331 Pa. 569, 576, 1 A.2d 662, 666 (1938).

¶ 49 It is abundantly clear that trustees may not profit from trust property. Cases old and new, decided by every level of court in this Commonwealth, support this basic rule. "[T]here is no principle better settled than that a trustee is not permitted to obtain any profit or advantage to himself in managing the concerns of the *cestui que trust*[18]." *Raybold,* 20 Pa. at 312. "It is a well recognized general rule that a trustee or fiduciary may not use trust property for his own benefit and if he does he is liable to a cestui que trust for profits made by him from the use of trust property." *Stahl, Attorney General, Appellant v. First Pennsylvania Banking and Trust Company,* 411 Pa. 121, 124, 191 A.2d 386, 388 (1963). *See also Comerford Estate,* 388 Pa. at 294, 130 A.2d at 466 (*citing Steele Estate,* 377 Pa. at 257, 103 A.2d at 409) ("[A trustee] may not profit at the expense of the trust estate or the beneficiaries thereof."); *Landis Trust,* 382 Pa. 486, 115 A.2d 167 (1955); *Haberman's Appeal,* 101 Pa. 329, 333 (1882) ("A trustee cannot thus be allowed to speculate or trade with the money or goods of the estate; if he does, he must account for the profits which he may realize therefrom."); *Hess' Estate,* 68 Pa. 454, 459 (1871).

> The general rule of equity, as stated by Judge Story, in *Oliver v. Piatt,* 44 U.S. 333, 3 How. 333, 11 L.Ed. 622, is, that the gain made by the trustee by a wrongful application of the trust-fund, shall go to the *cestui que trust,* and all the losses shall be borne by the trustee.

*Locher's Estate,* 219 Pa. 46, 48, 67 A. 954, 955 (1907) (*citing Robinett's Appeal,* 36 Pa. 174, 189 (1860)). "[A] trustee will not, under any circumstances, be allowed to

make a profit out of the trust funds. Whatever profit arises therefrom in any way belongs to the owner of the fund, and not to its custodian." *Appeal of Baker,* 120 Pa. 33, 47–48, 13 A. 487, 494–495 (1888) (Wherein the Court concluded that the law did not permit a trustee to derive in any manner a profit or personal advantage from the trust property, therefore the trustees were properly surcharged for the profits derived from the resale of property). *See also Cuyler's Appeal,* 5 Pa. D. & C. 317 (1924) (*citing Raybold, supra; Norris's Appeal,* 71 Pa. 106 (Pa.1872); *Appeal of Baker, supra.*)

¶ 50 Paxson makes much of his claim that the Trust sustained no loss as a result of the trustees repeatedly using it as collateral for the loans in question. That the Paxson's actions did not result in a decrease in the Trust's value in the end, however, does not relieve the necessity of a surcharge. A loss can be other than a reduction in value.

> "if the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) **any profit made by him through the breach of trust**; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust." Restatement (Second) of Trusts § 205.

*Dentler Family Trust,* 873 A.2d 738 (Pa.Super.2005) (emphasis added). *See also Scharlach,* 809 A.2d at 386. Thus a breach of trust makes the breaching trustee chargeable with any resulting profit. Here, the Paxsons were within their power as trustees when they used the Trust property as collateral for the loans in ques-

---

**18.** *"Cestui que* trust" is an alternative name for beneficiary. Black's Law Dictionary, 243 (6th ed.2004).

tion, but breached their duties as trustees when they personally profited by taking a portion of the loan proceeds for themselves. *Markowitz Trust,* 47 Pa. D & C 2d 775 (1969).[19] Thus, although the Trust did not lose value as a result of the Paxsons' actions, we find that the Paxsons committed a breach of their fiduciary duties by using the proceeds of the mortgages for their own benefit. Thus, they are chargeable with the profits made as a result of their breach.

¶ 51 As such, we remand the matter to Judge Lawler for a determination of the specific amount of profit made by the Paxsons as a result of their use of the Trust Property as collateral for the loans in question. In making such a determination, Judge Lawler must take into account the fact that additional properties were used as collateral for each of the loans, making only a percentage of the funds received attributable to the Trust property. If Judge Lawler finds the record inadequate to make these determinations, he may, in his discretion, re-open the record to permit the parties to offer additional evidence, or hold additional hearings.

¶ 52 In their second and fourth allegations of error, the Children argue that Judge Lawler should have traced the money derived from the loans and imposed a trust on the Farmhouse real estate and business.[20] The Children allege that because they traced specific amounts into the Farmhouse and Paxson Corp., Judge Lawler should have awarded them a money judgment or imposed a constructive trust upon the Farmhouse and Paxson Corp. properties.[21]

19. In *Markowitz Trust,* the trustee was granted the power to mortgage trust property, but was found in breach of trust when she did so for the purpose of buying a car for her personal use. *Id.* 47 Pa. D & C 2d at 776, 779.

20. The Children's second "statement of questions involved" asks "[w]hether the court committed error of law and abused its discretion in not tracing the capital gains derived by the parents commingling and self-dealing in the children's principal, and failing to impose constructive trusts consistent with such tracing?" Children's brief at 4. The corresponding argument section of their appellate brief words the allegation as such: "[t]he court also committed error of law and abused its discretion in refusing to trace the principal derived by the parents and failing to impose a trust upon the Farmhouse real estate and the Paxson Corp. stock, liquor license and business assets." *Id.* at 18. The Children's fourth "statement of questions involved" asks: [w]hether the court committed error of law and abused its discretion by declining to adopt the election of remedies made by the beneficiaries with respect to the tracing of trust principal versus the entry of a money judgment, and by not imposing a constructive trust upon the whole of the Farmhouse's and Paxson Corp.'s assets.

*Id.* at 4. This assertion is worded in the argument portion of the brief as follows: "[w]here, as here, the unfaithful fiduciaries failed to precisely prove what contribution they made to traced property, the whole should be subject to constructive trust for the beneficiaries. The chancellor erred in not imposing a constructive trust upon the whole of the Farmhouse and Paxson Corp. assets." *Id.* at 24.

21. As we explained above, the Paxsons and Arthur Azarchi, purchased the Sumney Tavern, as well as the real estate on which the Tavern was located, for a total of $650,000.00. N.T. 12/2/02 at 33, 108. The down payment required by the Paxsons was $150,000.00, and in furtherance of this obligation, they obtained the $150,000.00 commercial mortgage loan from Commonwealth State Bank, secured by the Paxsons' assets, the Zanni Trust property, and the land on which the Tavern was located. Adjudication, Findings of fact 55c, 59, 61; N.T. 12/2/02 at 108–109. The remainder of the Sumney purchase price was also financed by additional mortgages of $160,000.00, $130,000.00 and $60,000.00. Adjudication, Finding of fact at 66; N.T. 12/2/02 at 109–114.

¶ 53 We disagree that Judge Lawler erred in this regard. Although the Children seek to trace specific funds and argue that a constructive trust must be imposed, they have failed to prove that such a solution is appropriate. As we emphasized above, the Trust property was only **PARTIAL** collateral for the loans in question. Other, non-trust properties made up the additional collateral needed for each loan, thus the proceeds of each loan were only partially attributable to the Paxsons' wrongful use of the Trust property. The proper method to right this wrong is to surcharge the Paxsons for the profits actually attributable to the use of the Trust property, as we explained above.

¶ 54 The Children's remaining claim asks us to determine "[w]hether the court committed error of law and abused its discretion in giving a $125,000 credit to the parents for alleged improvements to the Zanni house, under evidence not admissible under applicable law, without proof of the respondents' contribution thereto, contrary to positive law, and admittedly made with the children's own money?" Children's brief at 4.[22]

¶ 55 Judge Lawler maintains that it was within his discretion to credit the Paxsons for $125,000.00 based on their "uncontested testimony." Rule 1925(a) Opinion dated 2/2/05 at 8.[23] He notes that "[t]he children do not contest that these improvements were made, increasing the value of the primary asset of the Trust, and did not contest the parent's claims as to the cost of the improvements at trial." *Id.* at 9. Our review of the record, however, shows that

the Children did object to Paxson's testimony regarding the amount spent.[24] Judge Lawler also states:

> The Parents credibly testified that the majority of the $100,000.00 mortgage loan obtained in 1988 was used to improve the quality of the Trust home. The 1987 Deed expressly permitted the Parents to mortgage the property for the benefit of the Trust, and the Children do not context that those improvements were made over the course of ten years. The balance of the 1988 mortgage for home improvements was refinanced by a 1996 mortgage from Commonwealth Bank, which was in turn paid off and satisfied by Mr. and Mrs. Paxson from proceeds of the heritage sale. The money judgments awarded fully compensate the Children for the proceeds of the Heritage sale, plus interest. This Court was therefore within its discretion in determining that a credit was due Mr. and Mrs. Paxson for reasonable, uncontested costs incurred in improving the Trust Home.

*Id.* at 9–10. Judge Lawler cites no case or statutory law to support his decision to credit the Paxsons for improvements made to the Trust Property.

¶ 56 An examination of the Children's brief reveals their challenge to Judge Lawler's decision to award the credit is threefold. The Children first claim that their parents made the improvements to the Trust Property at their own expense and without the acquiescence of the Chil-

---

**22.** The argument portion of the Children's brief words this issue as follows: "The court palpably ignored applicable law and abused its discretion first in allowing the admission of the father's guesstimate of improvements made to the Zanni house, then giving the parents a credit therefore, where the parents had the obligation for any claimed improve-

ments, and the source of the funds was the Children's own money." Appellants' brief at 21.

**23.** Judge Lawler does not cite to the portion of the record containing this testimony.

**24.** See footnote 26.

dren,[25] thus the Paxsons are not entitled to a credit for the money spent, even if it resulted in the Trust Property increasing in value. Children's brief at 22 (*citing In re Estate of Hewitt, supra.*) We agree.

¶ 57 If the improvements were made by the Paxsons in their capacity as life tenants, such improvements were made at their own expense. A life tenant is "responsible for ordinary repairs and maintenance, but improvements of a permanent nature, without the acquiescence of the remaindermen, are at his own expense even though the property in thereby made more valuable." *Estate of Hewitt,* 554 Pa. at 492, 721 A.2d at 1085 (*citing* Ladner on Conveyancing in Pennsylvania. § 1.03 (4th ed.1979, Sup.1994)). *See also Ginder Estate,* 68 Pa. D. & C.2d 243, 248–249 (1975) (*citing Datesman Appeal,* 127 Pa. 348, 17 A. 1086 (1889)).

¶ 58 Neither would the Paxsons be entitled to compensation if they made the improvements in their capacity as trustees. Our explanation for this conclusion ties in with the second portion of the Children's challenge to the credit, which alleges that Judge Lawler should have sustained their objections to John Paxson's testimony estimating the amount of money spent on the improvements. Children's brief at 23 (*citing Bracken Estate,* 13 Pa.D. & C.2d 37, (1957) ("On the issue of what portion of the respective contribution a trustee has made in capital improvements to trust property, the burden is on the trustee to establish 'by clear and satisfactory evidence' what proportion should be borne by the beneficiaries.")).

¶ 59 It is true that a trustee may receive repayment for money advanced for improvements to trust property. *La Rocca Trust,* 419 Pa. 176, 179, 213 A.2d 666, 667–668 (1965). Where credit is claimed for such expenditures, however, the burden rests on the trustee to justify them. *Strickler Estate,* 354 Pa. 276, 277, 47 A.2d 134, 135 (1946). "Proper vouchers or equivalent proof must be produced in support of such credits. Accountant's unsupported testimony is generally insufficient." *Id.* Additionally, "[a] trustee is entitled to indemnity out of the trust estate for expenses properly incurred by him but he is entitled to reimbursement only if he has used his individual property in discharging the liability. Restatement, Trusts, § 244(c)." *Dingee Estate,* 154 Pa.Super. 374, 35 A.2d 577, 579 (1944).

¶ 60 Here, Paula Lynn Paxson testified that she did not know how much the improvements cost. N.T. 2/12/03 at 16–17. John Paxson estimated that in excess of $125,000.00 was spent on the improvements, but no records were submitted in support of this figure, nor was the source of the money conclusively established as non-trust. N.T. 12/2/02 at 51–52.[26] As

---

**25.** The Children assert that as they were all minors at the time the improvements were made, they were legally incompetent to acquiesce to the improvements.

**26.** When asked about the improvements made to the Zanni house, John Paxson testified as follows:

Q. Do you have any record to show how much you paid?
A. You're going back twenty, twenty five years and I personally am not in possession of any records that we would have from that time. Any records that kind of do reflect that would still be over at School Road.
Q. And you're not, you're excluded from that property at the present time; isn't that right?
A. Yes, sir, Yes.
Q. Do you have an estimate? Could you tell us how much money you did pay for these improvements?
A. Do you want me to lump them all together or want me to separate them? How would you want me to say that?

such, the evidence presented to Judge Lawler was not sufficient to entitle the Paxsons to a credit for the improvements made.

¶ 61 The Children conclude their challenge to the credit by asserting that none is due since the source of the money spent was the Trust Property itself. Children's brief at 23–24. Specifically, the Children point to the $100,000.00 loan from First National Bank of Newtown, obtained on January 11, 1988 as a source of money used for improvements. Children's brief at 24 (*citing* R 561a, 930–31a; E84–86; FF 54–55(a)). An examination of these citations, however, does not support such a concise explanation. Although Paula Lynn Paxson testified that the loan was taken "to do some improvements," she also indicated that it was to "build a kennel to be a boarding kennel" and "to get us some income." N.T. 2/12/03 at 13–14. John Paxson testified in an equally vague manner that he "did a lot of things" with the loan (N.T. 12/2/02 at 57). The Children also cite to E84–86, a copy of the settlement statement for the loan, which provides no details of what portion of it was spent on the improvements. Even if we were to accept that a portion of the loan was used to pay for the improvements, the loan itself was only partially secured by the Trust property.

¶ 62 Despite the Children's failure to provide sufficient evidence to tie the improvements to the loan in question, however, we find that they have otherwise met their burden of showing that Judge Lawler erred in crediting the Paxsons with the improvements. Based on the testimony presented, we find the evidence inadequate to support the conclusion that the Paxsons, in their capacity as trustees, spent $125,000.00 of non-trust money on improvements to the Trust property. Therefore, we conclude that they are not entitled to a credit, and the portion of Judge Lawler's order granting such credit must be reversed. *Estate of Nesbitt*, 438 Pa.Super. 365, 652 A.2d 855, 857 (1995) (An appellate court can modify an Orphans' Court decree if the findings upon which the decree rests are unsupported by competent or adequate evidence).

¶ 63 Having disposed of all of the Children's claims, as well as John Paxson's assertion that he and Paula Lynn Paxson were granted life estates, we are left with the remaining four arguments Paxson raises on appeal. In addition to raising the existence of life estates, Paxson queries "[d]id the trustees engage in self dealing to justify the termination of the trust?" John Paxson's brief at 1, 17. Paxson acknowledges that a court "may direct or permit complete termination of a trust if, owing to the circumstances not known and anticipated by the settler, continuance of that Trust would defeat or substantially impair the accomplishment of the purposes for which it was established." *Id.* at 17 (*citing Estate of Day*, 455 Pa. 610, 317 A.2d 648 (1974)).[27] Here, as we noted

---

Mr. King: Objection. The law is in meeting that burden of proof they have to do that by clear and precise evidence, not speculation. They have to produce documentation to support the conclusion.
The Court: Sustained.
By Mr. Harrison: Can you tell me how much you spent?
Mr. King: Objection.
The Court: Overruled.

By Mr. Harrison: How much did you spend on these improvements?
A. In excess of a hundred to a hundred and twenty-five thousand.
N.T. 12/2/02 at 51–52. No records were submitted in support of this amount.

27. The Court in *Estate of Day*, relied on the following portion of the Probate, Estates and Fiduciaries Code:
§ 6102. Termination of trusts

above, Judge Lawler found that the Paxsons sold a portion of the Zanni Trust property, unlawfully conveyed title to what remained, then obtained a mortgage loan on the property, which they used for their own purposes. Adjudication at 30–31. Judge Lawler explained his reasons for terminating the Zanni Trust as follows:

The Zanni Trust is terminated because the original purpose of the conveyor Anthony L. Zanni, M.D. can not be carried out and/or is impractical of fulfillment due to:

a. the self-dealing with and the commingling of assets by the trustees John and Paula Lynn Paxson;

b. the separation and divorce of the trustees and the antagonistic and tumultuous breakup of their family.

Adjudication at 30–31. Paxson does not directly refute these conclusions, but instead argues that the Trust Deed allowed the Paxsons to mortgage the Trust Property and that in doing so they did not mismanage the property, but actually increased its value. He does not deny that he engaged in self-dealing, but argues instead that the Trust deed permitted such actions. John Paxson's brief at 20.

¶ 64 We acknowledge that the Trust deed empowered the Paxsons to mortgage the property in their capacity as trustees. We disagree, however, that it permitted self-dealing. As we discussed at length above, the Paxsons' position as trustees unquestionably obligated them to exercise the powers granted them by the Trust Deed for the advantage of the Trust bene-

ficiaries, not for their own personal benefit. In his unwillingness to recognize that a trustee may not benefit from use of trust property, Paxson puts the following spin on Dr. Zanni's intent in creating the Trust:

[T]he Chancellor ignored that the settler, Dr. Zanni, created the Trust instrument with the knowledge that the Paxsons may, at some time, be required to mortgage the premises for any purpose. Simply put, at the time of the *inter vivos* transfer, it cannot be ignored that the settler anticipated that the Paxsons would use the property to secure mortgages in order to provide for the families [sic] needs, including the acquisition of future restaurants. Specifically, prior to the transfer of the property in Trust in 1987, Dr. Zanni was well aware throughout preceding year that his daughter and son-in-law purchased and acquired approximately eight (8) restaurants/bars. (R.529a–538a).

John Paxson's brief at 20. The record cited to support this claim does not do so, however, and Judge Lawler was well within his bounds to reject the allegation.

¶ 65 Paxson further avers that if Dr. Zanni had intended to limit the use of the Trust property, he could have done so in the trust instrument. This argument "puts the cart before the horse." As Paxson would have it, a trust instrument would need to contain language of limitation in order to restrict a trustee to using trust property for the purposes of trust. As we discussed above, this is clearly not the case. By the very nature of his or her

(a) FAILURE OF ORIGINAL PURPOSE.— The court having jurisdiction of a trust heretofore or hereafter created, regardless of any spendthrift or similar provision therein, in its discretion may terminate such trust in whole or in part, or make an allowance from principal to one or more beneficiaries provided the court after hearing is satisfied that the original purpose of the conveyor cannot be carried out or is impractical of fulfillment and that the termination, partial termination, or allowance more nearly approximates the intention of the conveyor, and notice is given to all parties in interest or to their duly appointed fiduciaries.

*Estate of Day,* 455 Pa. at 613, 317 A.2d at 650 (*citing* 20 Pa.C.S. § 6102(a)).

position, a trustee is obligated in such a way, and to act otherwise breaches the fiduciary duty created by the position. Thus it was not necessary for Dr. Zanni to spell out in the Trust deed that the Paxsons were prohibited from putting the proceeds of a mortgage on the Trust property to their own use.

¶ 66 A reading of Judge Lawler's Adjudication, and a review of the evidence presented to him, confirms that the purposes of the Trust were impossible to carry out because the Trust had been rendered "empty" when the Paxsons transferred title to the Trust property into their own names. Paxson does not dispute that this occurred. Instead, he insists that it was his intention to transfer the title back to the Trust, but "[t]he commencement of the divorce action and the actions of the [sic] Paula Marie and Rebecca have prevented the Paxsons from conveying the Trust Property back to the Trust." John Paxson's brief at 5, 17. We find the Paxsons' alleged intentions immaterial, as their actions clearly rendered the Trust devoid of assets and without purpose.

¶ 67 Under the circumstances, we find no error in Judge Lawler's terminating the Trust. 20 Pa.C.S. § 6102; *Scott's Estate*, 51 Pa. D. & C. 688 (1944), *affirmed* 158 Pa.Super. 138, 44 A.2d 323 (1945), 353 Pa. 575, 46 A.2d 174 (1946).

¶ 68 Paxson next asserts that he and Paula Lynn Paxson should not be surcharged as a result of their actions as trustees. John Paxson's brief at 1, 21. We have already discussed the issue of surcharging at great length, and need only reiterate that the Paxsons are subject to a surcharge as the result of their use of Trust property for their personal gain.

¶ 69 Paxson's second to last statement of questions involved asks "[d]id the Chancellor properly deny the election of remedies by the beneficiaries." John Pax-

son's brief at 1. A review of the corresponding argument portion of Paxson's brief contains two sub-arguments under this heading, each of which contain multiple, and sometimes overlapping, allegations.

¶ 70 Sub-argument A is titled "PAULA MARIE'S INHERITANCE." John Paxson's brief at 23. Therein, Paxson argues (1) that Judge Lawler erred in concluding that Paula Marie's inheritance was traceable to the purchase of the County property, *Id.* at 25, and (2) that Judge Lawler improperly admitted testimony by William Mount, who made the assumption that the closing costs on the County Property were $3,500.00, *Id.* at 26.

¶ 71 In addressing these claims, we review Judge Lawler's findings on the issue. Specifically, he concluded that "Petitioner Paula Marie Paxson's $20,000 inheritance is traceable into the purchase of the County property, and then through the sale of the County property to Heritage, and had a total value of $175,770.00 as of May 7, 1998." Adjudication, Finding of Fact 152. Judge Lawler further found that:

> On May 7, 1998, the Paxsons conveyed to Heritage 4.64 acres of land designated as Sub–Area "A" on Exhibit P–48, an asset purchased with money, 80% of which came from the first partial payment of the inheritance of Paula Marie Paxson and unlawfully converted to their own use proceeds of the sale. $175,770.

Adjudication, Conclusion of Law 7. As a result of this determination, Judge Lawler entered judgment in favor of Paula Marie against John and Paul Lynn Paxson for "the proceeds of the Heritage sale and interest shall be added thereon at the rate of 6% from May 7, 1998 until the date of payment on the amount of $175,770.00." Order dated May 27, 2003.

¶ 72 Turning to Paxson's claim, we reiterate that in May of 1991, the Paxsons purchased 5.36 acres from Bucks County for $21,200.00. A review of the record shows that at that time, the Paxsons held a trust account with The First National Bank, in the name of "John Paxson or Paula Paxson, Trustees." Plaintiff's Exhibit 31. The account was opened in January, 1988. *Id.* Prior to the issuance of the $20,000.00 inheritance check, the Paxsons discussed it with Attorney Glantz, who represented Leonard Zanni, the executor of Dr. Zanni's estate.[28] N.T. 9/4/02 at 106. Attorney Glantz testified that the Paxsons inquired of him if there would be "any distribution forthcoming," and Attorney Glantz responded that he would recommend it to the executor. N.T. 9/4/02 at 107. Attorney Glantz further testified that he probably had more than one conversation of this nature with the Paxsons. *Id.* at 107, 109–110.

¶ 73 In addition to Attorney Glantz's testimony, Paula Lynn Paxson specifically testified that in anticipation of the purchase of the County property, she and John Paxson were "waiting with bated breath" to receive Paula Marie's inheritance check so they could "use it to purchase the property." N.T. 2/12/03 at 27. On March 21, 1991, Paula Marie's $20,000 inheritance check was deposited into the account, which had a previous month's balance of $1,053.14. On May 23, 1991 the Paxsons wrote a check from the account in the amount of $19,998.00 for the purchase of the County property.[29] John Paxson' brief at 24; Plaintiffs' Exhibit 33.

¶ 74 In disputing that Paula Marie's inheritance money was used to pay for the County property, Paxson does not contest that the check was deposited into the bank account in question, or that a check from that account in practically the same amount was shortly thereafter issued to Bucks County. Instead, Paxson asserts that it was error to identify Paula Marie's inheritance as the source of the $19,998.00 check because "money is fungible, it is impossible to identify the specific dollars of Paula Marie's inheritance, *if any,* which were alleged to have been borrowed and/or utilized for this purchase." John Paxson's brief at 25 (emphasis in original). Pointing to an alleged total of $16,069.66 withdrawn from the account between March of 1991 and May 30, 1991, Paxson argues that a majority of the inheritance money was already spent by the time the check was written to the County. Paxson maintains that if Paula Marie is entitled to anything, it is the return of her $20,000.00 inheritance, plus interest, not a share of the proceeds of the sale of the County property. *Id.* at 30. We disagree.

"Where the agent has mingled his own property with that of the principal, the latter may reclaim from the mixture an amount equal to his own, although it may not be the same identical property": *Webb v. Newhall,* [274 Pa. 135, 117 A. 793 (1922)]. And where a trustee has mingled trust funds with his own, and afterward takes sums from the common mass for his own use, it will be presumed, so long as the mass is as large as the original trust funds, that the sum so taken was his own and not the trust

---

28. As we noted above, Attorney Glantz also represented the Paxsons at the time he prepared the Zanni Trust Deed. N.T. 12/2/02 at 38

29. A $2,000.00 deposit on the property had been previously made. John Paxson testified that it was made "much prior" to the settlement, but contrary to the assertions in his brief he did not testify that it was from the Paxsons "sole and exclusive funds." John Paxson's brief at 24; N.T. 12/2/02 at 73.

funds: Perry on Trusts, section 828; 39 Cyc. 539, and cases cited in note 32. *Vosburgh's Estate,* 279 Pa. 329, 333, 123 A. 813, 815 (1924). "[W]here an account contains mingled trust funds and individual funds of the trustee, and the trustee withdraws money therefrom for his personal use, there is a presumption that he is drawing his own money first and not embezzling any of the trust funds." *Mercer County v. Cantelupe,* 341 Pa. 454, 462, 19 A.2d 474, 477 (1941).

¶ 75 In the case at hand, Paula Marie's check was deposited into the Paxsons' account. Any withdrawals made would be presumed to be the Paxsons' money, *Mercer County, supra; Vosburgh's Estate, supra,* but that presumption is rebutted with regard to the $19,998.00 check written to the County because Paula Lynn Paxson credibly testified that Paula Marie's money was used to pay for the County property. N.T. 2/12/03 at 27. As such, we find no error in Judge Lawler's conclusion in this regard.

■ ¶ 76 Paxson also asserts in Sub-argument A that:

[T]o permit Mr. Mount's testimony [regarding the closing costs incurred in purchasing the County property] without the proper foundation severely prejudiced Husband because the Chancellor, in adopting Mr. Mount's testimony, awarded the Children damages based solely upon this expert's testimony, said testimony which was not based upon reasonable certainty but upon facts supplied solely by the children's attorney.

John Paxson's brief at 26. To the extent that this is a claim that the testimony in question should not have been admitted, it is waived for failure to object at trial. *Partrick and Wilkins Company v. Adams,* 471 Pa. 63, 69, 369 A.2d 1195, 1198 (1977); *Bowe v. Allied Signal,* 806 A.2d 435, 440 (Pa.Super.2002). Mr. Mount was ques-

tioned regarding how he formed his opinion as to the proper allocation of the $350,000 received from Heritage. N.T. 10/22/02 at 65. During this line of questioning, the following exchange occurred:

ANSWER. [BY MR MOUNT] Parcels A and C were purchased from the county at a purchase price of $21,500. I don't know what additional costs there may have been in the acquisition of that property, costs borne by the buyer. I made an assumption that the total costs of acquiring that property from the county was $25,000.

MR. HARRISON [for John Paxson]: Objection, assuming a fact not in evidence.

THE COURT: Wait.

MR. HARRISON: I can withhold that objection until he's asked to formulate an opinion or we can address it now with your testimony and save us all a lot of time, Mr. King.

MR KING [for the Children]: Fine. Sure.

THE COURT: All right.

BY MR. KING:

Q. Where the purchase price you're referring to is $21,000 and some dollars, was the purchase price paid by Paula Paxson to the county?

A. I think I misspoke.

MR. HARRISON: Again, objection. He's assuming a fact not in evidence that Paula Paxson paid for it.

BY MR. KING: As reflected in the deed form the Count of Bucks to Paula Paxson, what was the consideration stated in the deed?

A. $21,500.

THE COURT: Overruled.

*Id.* at 65–66. From this exchange, we see that discussion with opposing counsel and Judge Lawler occurred after Pax-

son's attorney objected. Questioning resumed after the discussion, the objection was renewed, and it was overruled. The objection was not to the amount of the additional costs, but to Mr. Mount's assumption that Paula Paxson paid for the property. Immediately after the objection was overruled, the following exchange occurred:

> BY MR. KING: You said you assumed some additional monies had to be put into that, for purposes of what?
>
> A. Settlement costs, the normal thing included in settlement costs. But of course I didn't attend settlement and I haven't seen the settlement sheet, I don't know what they were. I made the assumption that there was an additional $3,500 in costs of acquisition for a total of 25,000.

*Id.* at 66. No objection to this testimony was made. Thus any complaint regarding the admission of the testimony is waived.

¶ 77 Neither is Paxson entitled to relief if his brief is to be read as objecting to Judge Lawler's reliance on the testimony of Mr. Mount based on Mr. Mount's assumption of the $3,500.00 figure. Paxson complains that the figure was merely a "guess," and points to his own testimony that the costs in question were in excess of $12,000.00. John Paxson's brief at 26. A review of Paxson's testimony, however, shows that he himself could provide only a guess as to the actual figure spent. N.T. 12/2/02 at 68–69. Paxson has failed to persuade us that we should disturb Judge Lawler's conclusion in this regard. *Scheidmantel, supra.*

¶ 78 Turning to sub-argument B, titled "HERITAGE BUILDING GROUP SALE," we find that it sets forth three allegations of error. John Paxson's brief at 26. Paxson first asserts that "the Chancellor, without expert testimony from the Children, erroneously concludes that the Paxsons obtained the County property with the sole and exclusive funds of Paula Marie." *Id.* at 28. This argument provides Paxson no relief, for the reasons discussed above.

¶ 79 Sub-argument B next asserts that: [I]n receiving any portion of the inheritance of Paula Marie, the Paxsons were not acting in their fiduciary duty as either Trustees for the Children of Executors for the estate of Dr. Zanni. To the contrary, in receiving the inheritance, the Paxsons were acting as "parents" of their then minor child, Paula Marie. Essentially, in awarding Paula Marie the lion's share of the Heritage Proceeds, the Chancellor erroneously concluded that the Paxsons owed a fiduciary duty to Paula Marie to the prejudice of the other Paxson Children. As such, the lower court imposed a standard of care upon the Paxsons which exceeds that which is required of trustees or executors.

*Id.* at 29. This claim is simply not supported by any coherent argument that would require reversal. *Scheidmantel, supra.*

¶ 80 Sub-argument B lastly claims that "the Chancellor, in adopting Mr. Mount's calculation of damages to be awarded to Paula Marie and her siblings, committed a second mathematical error." *Id.* at 30. Paxson explains:

> In computing the "contribution" of Paula Marie's inheritance, Mr. Mount stated that $20,000.00 came from Paula Marie which represented 80% of the purchase price of $25,000.00, and this amount included the $3,500.00 in acquisition costs. The expert then stated that Paula Marie's interest in the County parcel of 80% represented 4.64 acres or 50.22 of the total acreage sold. He then testified as follows: "Her interest in A was eighty percent. Eighty percent of that

50.22 percent multiplied by the $350,000 purchase price ends up with a share of 175,770." (R. 456a).

However, 80% of 50.22% of $350,000 does not equal $175,770; it equals $140,616.00.

*Id.* at 31.[30] Although Paxson did not object to the above cited testimony, or attempt to expose the error on cross examination, it appears that he is correct that such an error was made. Paula Marie's $20,000.00 inheritance was used toward the purchase of the County property, which, with expenses, cost $25,000.00. Her inheritance money made up 80% of the purchase price of the property, giving her an 80% "share" (.8 × 25,000 = 20,000). A portion of the County property and a portion of the Zanni Trust property were subsequently sold to Heritage for $350,000.00. The County property made up 50.22% of the "combined" parcel. Thus the portion of the County property sold to Heritage was proportionally worth $175,770.00 (.5022 × 350,000 = 175,770). Paula Marie, holder of an 80% share in the County property is thus entitled to 80% of the amount received for it, or $140,616.00 (.8 × 175,770 = 140,616). To correct this mathematical error, Judge Lawler's award of $175,770.00 plus interest to Paula Marie is reduced to $140,616.00, plus interest.

¶ 81 Paxson's final claim on appeal is that Judge Lawler failed to apply the statute of limitations to bar Paula Marie's claims with regard to her inheritance. John Paxson's brief at 1, 33.[31] We find no merit to Paxson's allegation, which claims that Judge Lawler should have believed his testimony and disbelieved that of Rebecca and Paula Marie. Such a credibility determination was properly made by Judge Lawler, and we will not disturb it. *In re Trust of Mintz*, 444 Pa. 189, 202, 282 A.2d 295, 302 (1971); *Scheidmantel, supra.*

¶ 82 For the foregoing reasons, we affirm in part and reverse in part Judge Lawler's Order of May 27, 2003, and remand the matter in accordance with this memorandum to allow the lower court to determine the value of the Paxson's life estates, and to establish the appropriate amount of surcharge against them.

¶ 83 KLEIN, J., joins and files a concurring statement.

¶ 84 PJE McEWEN concurs in the result.

---

30. An examination of the record reveals that Mr. Mount testified that the $20,000.00 which he was asked to assume came from Paula Marie made up eighty percent of the $25,000.00 purchase price of the County property. N.T. 10/22/02 at 68. The following exchange then took place:

Q. All right. Now, what did you then do to make an allocation with respect to the sale price of $350,000 to Heritage?
A. Heritage bought, Your Honor, parcels A and B, which are the parcels to the left on that diagram. Those two parcels totaled—well, let me say that differently. Of the total of those two parcels, A and B, A, which we're saying that Paula the daughter had an interest in, was 4.64 acres or 50.22 percent of the total.
Q. All right.
A. Her interest in A was eighty percent. Eighty percent of that 50.22 percent multi-

plied by the $350,000 purchase price ends up with a share of 175,770.

N.T. 10/22/02 at 68. On cross examination Mr. Mount testified regarding how he arrived at the eighty percent figure as follow:

$20,000 is eighty percent of twenty-five. And I applied that, I made a pro rata based on acreage allocation of the sale price to Heritage of $350,000, same value per acre for A as for B, and applied that pro rata allocation to the $350,000 sale price and multiplied it by eighty percent.

*Id.* at 79.

31. Paxson initially also included an argument that Judge Lawler failed to apply the doctrine of laches to bar the Children's claims, but has since dropped this claim. John Paxson's reply brief to Children's reply brief at 13.

CONCURRING STATEMENT BY KLEIN, J.:

¶ 1 I join in the majority Opinion.

¶ 2 I certainly understand the difficulty in unscrambling this matter where the trust language is somewhat cryptic and the trustee/beneficiaries totally ignored the fact that the property was in trust.

¶ 3 Normally, the remedy should be to remove the Paxsons as trustees, return any property improperly taken from the trust to the trust, recover the profits from other transactions proportional to the amount of trust property used as collateral for those transactions, and then pay the income to the Paxsons for their lifetime. However I agree with the majority that considering the marital breakup and the extent of the hostility between Father and Mother and the children, it was not an abuse of discretion for the trial judge to find that the trust purpose failed and to terminate the trust. I also agree with the majority that this does not extinguish the life interest in the Paxsons, and they should receive the value of their life interest.

¶ 4 I also agree that any profit attributable to the misuse of trust property should be considered returned to the trust. However, that property should be returned to the trust *before* terminating the trust. While the Paxsons are responsible for reimbursing the trust for personal profits made by misuse of trust property, the value of the life interest should be computed *after* those sums returned to the trust.